IUE AFL–CIO PENSION FUND and Lloyd J. Hayes, John S. Vozella, James C. Vito and Peter S. Di Cicco, Trustees of the IUE AFL–CIO Pension Fund, Appellants in No. 85–5385,

v.

BARKER & WILLIAMSON, INC., Sentinel Electronics, Inc. and Timetco Corp.

IUE AFL–CIO PENSION FUND and Lloyd J. Hayes, John S. Vozella, James C. Vito and Peter S. Di Cicco, Trustees of the IUE AFL–CIO Pension Fund

v.

BARKER & WILLIAMSON, INC., Sentinel Electronics, Inc. and Timetco Corp.

Appeal of SENTINEL INC. ("Sentinel").

IUE AFL–CIO PENSION FUND and Lloyd J. Hayes, John S. Vozella, James C. Vito and Peter S. Di Cicco, Trustees of the IUE AFL–CIO Pension Fund

v.

BARKER & WILLIAMSON, INC., Sentinel Electronics, Inc. and Timetco Corp.

Appeal of BARKER & WILLIAMSON, INC.

Nos. 85–5385, 85–5417 and 85–5429.

United States Court of Appeals, Third Circuit.

Argued March 7, 1986.

Decided April 10, 1986.

Andre Shramenko, Fort Lee, N.J., Thomas M. Kennedy (argued), Lewis, Greenwald, Kennedy & Lewis, P.C., New York City, for appellants IUE AFL–CIO Pension Fund, Hayes Vozella, Vito and Di Cicco in No. 85–5385.

Stanley A. Epstein (argued), Linda G. Harvey, Greenberg, Dauber & Epstein, Newark, N.J., for appellant Sentinel Electronics, Inc. in No. 85–5417.

Patrick C. English, Dines & English, Clifton, N.J., for appellant Barker & Williamson, Inc., in No. 85–5429.

Before ALDISERT, Chief Judge, and SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Chief Judge.

This appeal presents a question under federal pension laws and requires us to decide whether the district court properly held that the appellant corporation, Sentinel Electronics, Inc., was a member of a controlled group with Barker & Williamson, Inc. ("B & W"). B & W had ceased operations and defaulted on its payments to a pension fund. The district court held that Sentinel was a member of a controlled group with B & W, and deemed Sentinel to be the employer of B & W's employees. This determination imposed upon Sentinel liability for B & W's delinquent payments to the fund under provisions of the Multiemployer Pension Plan Amendments Act (MPPAA) of 1980, 29 U.S.C. § 1381 *et seq.* (amending provisions of ERISA, 29 U.S.C. § 1001 *et seq.*). We must also decide whether notice to B & W of its withdrawal liability, as required by the MPPAA, constituted constructive notice to Sentinel. We agree with the district court's controlled group determination. We disagree with its conclusion that notice to B & W was inadequate notice to Sentinel.

### I.

From 1971 until 1982, B & W contributed to the IUE AFL–CIO Pension Fund pursuant to collective bargaining agreements. On February 26, 1982, after a transaction involving Sentinel stock, B & W closed down. Just prior to the shutdown on February 17, 1982 the Fund advised B & W that B & W would be liable for withdrawal liability from the Fund if it closed. On September 1, 1982, in accordance with the MPPAA notice provisions, the Fund demanded payment of withdrawal liability from B & W in quarterly installments. On November 2, 1982, the Fund advised B & W that it had failed to make its first quarterly payment.

Over six months later, the Fund brought a claim against B & W for withdrawal liability incurred under the MPPAA. The district court later permitted the Fund to amend its complaint to add Sentinel Electronics, Inc., and Timetco Corp. The amended complaint alleged these corporations were members of a controlled group with B & W, as defined by ERISA, and that all three corporations should therefore be deemed to collectively comprise a "single employer" of B & W's employees. Sentinel and Timetco moved to dismiss, arguing that they were not single employers within the meaning of ERISA. The district court rejected the dismissal motion as to Sentinel and held that Sentinel would be liable for withdrawal liability along with B & W. Sentinel thereafter requested arbitration of the amount of withdrawal liability, and the Fund refused. App. at A122–23. The Fund then moved for summary judgment against B & W and Sentinel, claiming that by not responding to the Fund's original demand for payment of withdrawal liability, B & W and Sentinel had waived their right to contest the demand. *See* 29 U.S.C. § 1401(b)(1). Sentinel cross-moved for an order compelling arbitration.

The district court found that by not demanding review and arbitration of its withdrawal liability, B & W had waived its right to do so, and granted the Fund summary judgment against B & W for $168,871.00. The court, however, stayed the judgment pending an assessment of Sentinel's liability. App. at A162. But the district court reasoned that Sentinel did not know that it would be liable for B & W's withdrawal liability until the court's ruling binding Sentinel and that therefore Sentinel had ninety days after January 18, 1985, the date of the ruling, to request review by the Fund of its liability. *Id.* Because Sentinel could not request arbitration without previously requesting review by the Fund of its liability, *see* 29 U.S.C. § 1401(a)(1), the court decided to consider Sentinel's April 8, 1985 request for arbitration as a request for review by the Fund, and granted Sentinel's cross motion to compel arbitration pending review of Sentinel's withdrawal liability by the Fund and a subsequent "timely demand [by

Sentinel] that an arbitration be held." App. at A166–67. The Fund appealed, and Sentinel and B & W cross-appealed.

## II.

■ In appeal No. 85–5385, the Fund argues that the district court erred on the question of notice. It contends that notice to B & W was sufficient notice to Sentinel. The court determined that no such notice was made until the court determined that Sentinel and B & W were members of a controlled group. In its cross-appeal, No. 85–5417, Sentinel argues that the district court erred by not granting summary judgment in its favor and by concluding that Sentinel and B & W were members of a controlled group under 29 U.S.C. § 1301(b). Because both parties contend that they were entitled to summary judgment on these issues as a matter of law, review is plenary. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 574 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). B & W also filed a cross-appeal, No. 85–5429, challenging the district court's judgment against it for the full amount of withdrawal liability. However, because we find that appeal untimely, we will not address the merits.

## III.

We first address B & W's cross-appeal at No. 85–5429. The district court entered its order granting judgment against B & W on May 20, 1985. The Fund filed its appeal on June 7, 1985. Two cross-appeals followed. Sentinel filed its cross-appeal thirteen days later. B & W, however, did not file its appeal until June 25, 1985, 35 days after the original order was entered, and 18 days after the Fund filed its notice of appeal.

■ Rule 4(a)(1), F.R.A.P., allows a thirty day period for filing appeals after "the entry of the judgment or order appealed from." Once any party files a timely appeal, "any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed, *or* within the time otherwise prescribed by this Rule 4(a) [30 days], *whichever period last expires.*" Rule 4(a)(3), F.R.A.P. (emphasis supplied). Because the Fund filed its notice, the first notice of appeal, on June 7, 1985, the original thirty day period for appeals expired on June 19, 1985. Yet the fourteen day period allowed for filing cross-appeals expired two days later, on June 21, 1985. B & W's notice of appeal, filed June 26, 1985, was therefore five days late and will be dismissed as untimely.[1]

## IV.

■ Both B & W and Sentinel appeal from the district court's final order of May 20, 1985, which: (1) confirmed its earlier order finding Sentinel and B & W to be brother-sister controlled corporations; (2) denied the Fund's motion for summary judgment against Sentinel; and (3) granted Sentinel's motion to compel arbitration. Because the district court compelled arbitration, its order is reviewable as a final judgment under 28 U.S.C. § 1291. *See United Steelworkers v. American Smelting and Refining Co.*, 648 F.2d 863, 866 (3d Cir.1981) (citing *Goodall-Sanford, Inc. v. United Textile Workers, Local 1802*, 353

---

1. B & W made no attempt to explain the delinquency of its cross appeal or obtain an extension under Rule 4(a)(5), F.R.A.P., for excusable neglect or good cause until this court requested it to submit supplemental briefing concerning its tardiness. B & W thereupon petitioned the district court to have its appeal deemed timely filed, relying on *Torockio v. Chamberlain Manufacturing Co.*, 456 F.2d 1084 (3d Cir.1972), and the district court granted its motion. In *Torockio* we held that a district court had the authority to deem as timely filed an appeal filed between 30 and 60 days after the final judgment, regardless of when the tardy appellant so moved under Rule 4(a)(5). However, in 1979 Rule 4(a)(5) was amended to correct the ambiguity in the rule which *Torockio* was based on. We have since held that under that rule as amended, any Rule 4(a)(5) motion to extend the appeal period must be filed at least within 60 days after the final judgment. *West v. Keve*, 721 F.2d 91, 97 (3d Cir.1983). Because B & W did not so move until February 26, 1985—nine months after the judgment, the district court had no authority to grant its motion. Furthermore, B & W's proffered reason for its untimeliness did not constitute excusable neglect.

U.S. 550, 551–52, 77 S.Ct. 920, 921, 1 L.Ed.2d 1031 (1957)).

### A.

ERISA incorporates the Internal Revenue Code's "controlled group" standards for determining whether two related corporations are within a controlled group and therefore deemed to be a single employer. 29 U.S.C. § 1301(b). The district court found that B & W and Sentinel were brother-sister controlled groups under 26 U.S.C. § 1563(a)(2). This section defines a brother-sister controlled group as one in which five or fewer persons own at least 80% of the voting stock of each corporation, *and* if the same persons own more than 50% of the voting stock, taking into account each person's interest only to the degree of identical stock ownership in each corporation. *Id.* In *United States v. Vogel*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982), the Supreme Court ruled that each of the five or fewer persons must own some stock in each corporation to meet the 80% test.

Under 29 U.S.C. § 1383(a)(2) an employer completely withdraws from a multiemployer plan when it ceases "all covered operations." Because B & W ceased its operations on February 26, 1985, we are required to examine Sentinel and B & W's stock ownership as of that date. In early January 1982, Lee S. Engle owned 100% of Sentinel's stock and 75% of B & W's stock. B & W's president, Martin Piltch, owned the remaining 25% of B & W. stock. On January 27, 1982, Piltch reported to a joint meeting of the shareholders and Board of Directors of B & W that he had received and accepted an offer from Sentinel Electronics to purchase his 25% share of B & W. The shareholders and directors of B & W directed its officers to record the transfer of Piltch's shares to Sentinel upon receipt of the assignment of those shares. App. at A33. Another joint meeting was held on February 26, 1982. Acting as B &

W's Chairman of the Board, Engle reported that the assignment of Piltch's shares to Sentinel had been received, and that as sole remaining shareholder of B & W, Engle had donated his shares to Sentinel. The termination of B & W's operations as of the close of business on February 26, 1982 was also ratified at that meeting. *Id.* at A35.

The district court determined that at the time B & W terminated its operations, Sentinel either owned or had an option on all of B & W's shares and that Engle owned all of Sentinel's shares. *Id.* at A98. The consequence of this determination was that one person, Engle, controlled both corporations, and that the corporations were therefore brother-sister corporations under 26 U.S.C. § 1563(a)(2).

In so concluding, the district court relied on two stock ownership attribution rules to determine controlled group status. Under 26 U.S.C. § 1563(e)(1) a person is deemed to own all shares on which he has an option. Under 26 U.S.C. § 1563(e)(5), ownership of stock held by a corporation is attributed to shareholders of the owning corporation according to the percentage of their holdings in that corporation. Thus, Sentinel's ownership of B & W stock would in turn be attributed to Sentinel's shareholders according to the percentage of their ownership of Sentinel stock. Because Engle owned 100% of Sentinel's stock, all of the stock owned by Sentinel would be attributed to Engle.[2] Engle's affidavit admits that on February 26, 1982, he owned 100% of Sentinel's stock, and 75% of B & W stock. App. at A182. The district court determined that because Sentinel at least had an option on Piltch's 25% interest in B & W, it therefore "owned" those shares; moreover, that ownership would be attributed to Engle. The district court's characterization of Sentinel's interest in the stock

---

**2.** Although the corporate minutes of February 26, 1982, indicate that the transfer of Piltch's and Engle's shares to Sentinel actually occurred before B & W ceased operations, *see* app. at A35, Engle's affidavit contradicted this. *Id.* at A182.

Therefore, a material issue of fact existed as to whether Sentinel actually owned 100% of B & W's stock at the time of withdrawal, and summary judgment on that issue would have been inappropriate.

as an "option," and constructively owned by Sentinel, thus becomes the crucial issue.

## B.

Sentinel attacks the district court's characterization of Sentinel's interest in the B & W stock as of February 26, 1982 as an "option." Because ERISA does not define "option" we must borrow from traditional common law to develop the necessary federal common law for interpreting the statutory language. *See, e.g., Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1216–17 (8th Cir.) (discussion of federal common law), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Our reliance on such common law, however, must be consistent with ERISA's and the MPPAA's provisions and underlying policies. As Roger Traynor stated, we need literate, not literal judges. A common-sense reading of the statute indicates that in incorporating the revenue code's common control provisions into the MPPAA, Congress was more concerned with the degree of control exercised over the corporation involved than with precisely classifying any particular agreement as an option. We must therefore determine if the agreement between Piltch and Sentinel conferred on Sentinel at least that degree of control over the shares involved that an option would confer. We conclude that such control was present.

The Restatement of Contracts defines an option contract as "a promise which meets the requirements for the formation of a contract and limits the promisor's power to revoke an offer." Restatement (Second) of Contracts § 25 (1981). Applying this definition to the facts of this case, we must first determine if the "requirements for the formation of a contract" were met here. The Restatement defines those requirements as "a bargain in which there was manifestation of mutual assent to the exchange, and a consideration." *Id.,* § 17. Here there was undoubtedly a bargain and a "manifestation of mutual assent" as of the January 27, 1982 board meeting. At that meeting Piltch reported to a joint meeting of the stockholders and Board of Directors of B & W that he had received and accepted an offer from Sentinel Electronics to purchase his 25% of B & W stock. App. at A33. Appellant does not refute this and we may deem it to be true. Therefore, both parties manifested their mutual assent to the stock sale. Next, we examine the consideration element. At oral argument, appellant stated that the district court's finding that an option existed fails because of inadequate consideration because no price was specified. Again we turn to the Restatement, which states that "a promise which is bargained for is consideration if, but only if, the promised performance would be consideration." Restatement (Second) of Contracts § 75 (1981). Piltch's promised performance of delivery of 25% of B & W's stock certainly is adequate consideration to support his promise to sell. More importantly, though, Sentinel's promise to buy Piltch's shares does not fail to constitute consideration because no price was specified for the shares involved. We are persuaded by the modern view on this issue embodied in the Pennsylvania Commercial Code which states that "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if (a) nothing is said as to price." 12A Pa. Cons.Stat.Ann. § 2–305(1)(a). Therefore, adequate consideration also existed to support Sentinel's promise to buy Piltch's B & W shares, and all the requirements for the formation of a contract between Piltch and Sentinel existed as of the January 27th board meeting.

The remaining requirement for an option contract under § 25 of the Restatement is that there be some limitation on Piltch's power of revocation. The comments to that section state that the "principal legal consequences of an option contract is that ... it limits the promisor's power to revoke an offer." Restatement (Second) of Contracts § 25, comment d (1981). Normally the power to revoke an offer exists until the offeree has accepted. *Id.* § 36. However, here Piltch had accepted Sentinel's

offer. He could only escape performance by Sentinel agreeing to a mutual recision, release, or contract not to sue. In other words, Piltch was bound to sell his shares to Sentinel. By simply tendering a reasonable price, Sentinel could demand Piltch deliver his shares to it.[3] The required limitation on Piltch's power to revoke the agreement was present.

Therefore the district court's characterization of the agreement between Piltch and Sentinel on February 26 as an option was not error. Sentinel could exercise at least the requisite degree of control over Piltch's shares that an option would confer. Furthermore, we find this interpretation of the term "option" to be fully consistent with and in furtherance of the legislative intent of both ERISA and the MPPAA.

### C.

Sentinel argues that because the Statute of Frauds set forth in the Pennsylvania Commercial Code requires a contract for the sale of securities to be in writing, 13 Pa.Cons.Stat.Ann. § 8319, Sentinel's option was unenforceable and therefore invalid. The district court found that for ERISA purposes, it was sufficient that the transaction was consummated in accordance with its terms. App. at A101.

■ Although we may disagree with the district court's stated reasons for its finding, we think that its conclusion was correct. We believe that Sentinel's reliance on § 8319 is misplaced and conclude that the Statute of Frauds simply does not apply here. The Pennsylvania statute states:

> A contract for the sale of securities is not enforceable *by way of action or defense unless:*
>
> ....
>
> (2) delivery of the security has been accepted or payment has been made but the contract is enforceable under this paragraph only to the extent of such delivery or payment;

18 Pa.Cons.Stat.Ann. § 8319 (emphasis supplied). Sentinel's situation does not come within the express terms of the Pennsylvania statute. This is not an action to enforce "a contract for the sale of [B & W] securities." Rather, Sentinel seeks to assert the statute to avoid imputed ownership of the B & W stock. Moreover, because the contract was performed, it also comes outside the express terms of the statute under § 8319(2) because "delivery of the security has been accepted" by Sentinel. Also, to permit Sentinel to raise the statute as a defense here would permit the application of the statute outside the scope of the original intent. Statutes of Fraud are designed to prevent enforcement of fraudulent contracts. *Haskell v. Heathcote*, 363 Pa. 184, 188, 69 A.2d 71, 73 (1949). "The statute is designed not to encourage frauds, but to prevent them. . . ." *Gerlock v. Gabel*, 380 Pa. 471, 477, 112 A.2d 78, 81 (1955). Where the contract has been performed and fraud is not an issue, as here, the statute does not apply. *Id.* The Statute of Frauds, therefore, provides no shield for imputing ownership of the B & W stock to Sentinel, and consequently to Engle.

### V.

■ Sentinel next argues that the district court erred by not applying the restrictions of 26 U.S.C. § 1563(b), providing that the ownership requirement for a controlled group must be met for six months in any taxable year to which the restrictions apply. Section 1563(b) immediately follows § 1563(a), which establishes the ownership requirements for a controlled group. The district court found that it was improper to apply the time limitation of § 1563(b)—designed for computation of corporate surtax exemptions—in an ERISA context, where the key date is not December 31 of any year, but rather the date of withdrawal from the pension fund. App. at 102. We agree.

ERISA specifically limits its adoption of the Internal Revenue Code in applying the

---

**3.** Technically, Sentinel was the offeror here, and the "power to revoke" pertains to its offer and not Piltch's acceptance. However, in this con-

text, because Sentinel possessed the required element of control of the shares in question, this distinction is meaningless.

controlled group principles of § 1563(a). ERISA refers for its definition of "common control" to 26 U.S.C. § 414(c). 29 U.S.C. § 1301. That section, in turn, adopts by reference "the principles similar" to those set forth at 26 U.S.C. § 414(b). Finally, § 414(b) provides that employees of a controlled group within the meaning of 26 U.S.C. § 1563(a) shall be treated as employed by a single employer. The literal statutory language referring only to § 1563(a) and not to § 1563(b) is obvious recognition that subsection (b), requiring a six month control period, had meaning only for the purpose of computing corporate surtax exemptions under § 1561 and § 1562 of the Code.[4] Moreover, an Internal Revenue regulation indicates that § 1563(b) should not apply when determining controlled corporation status for other ERISA purposes when tax-year considerations do not apply.[5]

Sentinel relies on *Pension Benefits Guarantee Corp. v. Jeanette Newspapers*, 585 F.Supp. 1281 (W.D.Pa.1984), holding the purchaser of an insolvent corporation was not liable for pension fund delinquencies as a single employer under § 1563(a). There are significant factual differences in the cases. No prior relationship existed between the purchaser corporation and the acquired employer corporation in *Jeanette Newspapers*. The sales contract specifically stipulated that the purchase was contingent upon termination of the pension plan. *Id.* at 1283. The purchaser corporation, therefore, could not possibly have gained control of the defaulting employer until the pension plan was terminated. The court held that finding the purchaser liable for prior delinquent pension plan payments would not advance the purposes of the MPPAA. *Id.* Similar considerations do not compel the same result here.

■ Accordingly, we conclude that neither the district court's denial of summary judgment to Sentinel nor its determination that Sentinel and B & W were single employers under ERISA was in error. We now turn to the Fund's appeal.

## VI.

The Fund argues that the district court erred by deeming the date of its opinion holding Sentinel and B & W to be single employers to be the date of Sentinel's first notification of a deficiency—notwithstanding the Fund's prior notices to B & W of B & W's deficiencies. The district court held that January 18, 1985 was the first date "that Sentinel knew it would be subject to the same withdrawal liability as B & W," app. at A162, and deemed that to be the starting date for the running of the ninety day period in which Sentinel could request review of its withdrawal liability by the Plan under 29 U.S.C. § 1399(b)(2). Otherwise, Sentinel's request for arbitration would have fallen well outside the required period, and Sentinel would be deemed to have defaulted on its payments, requiring payment of the full amount due as calculated by the Fund. *See* 29 U.S.C. §§ 1399(c)(5); 1401(b)(1). We conclude that

---

**4.** Although we earlier relied on the attribution rules of subsections 1563(d) and (e), we note that subsection 1563(a) expressly incorporates those subsections for purposes of determining ownership. Subsection 1563(a)(2) specifically modifies its use of the word "own" for determining ownership status *viz.* a brother-sister controlled group with the parenthetical "(within the meaning of subsection (d)(2))." Subsection 1563(d)(2), captioned "Rules for determining stock ownership—Brother-sister controlled group" specifically includes "stock owned with the application of subsection (e)." Therefore, the statute specifically incorporates the ownership rules of subsections (d) and (e) into subsection (a). Subsection 1563(a), however, does not expressly incorporate subsection 1563(b).

**5.** The regulation states that:

For purposes of applying the provisions of sections 401 (relating to qualified pension, profit-sharing, and stock bonus plans), 410 (relating to minimum participation standards), 411 (relating to minimum vesting standards), and 415 (relating to limitations on benefits and contributions under qualified plans), all employees of two or more trades or businesses under common control within the meaning of § 11.414(c)-2 *for any period* shall be treated as employed by a single employer. 26 CFR § 11.414(c)-1 (1982) (emphasis supplied).

the district court's ruling is contrary to the letter and intent of ERISA and the MPPAA and we will therefore reverse.

### A.

Deeming that actual notice to the employer corporation serves as constructive notice to all other members of a controlled group is consistent with the language and purpose of both ERISA and the MPPAA. "Statutory interpretation begins with the language of the statute itself." *Kosak v. United States*, 679 F.2d 306, 308 (3d Cir.1982). The language of ERISA indicates that pension funds should be entitled to deal with members of a controlled group as a single entity. Congress provided that "[f]or purposes of this subchapter [Subchapter III of ERISA] ... all employees of trades or businesses ... which are under common control shall be treated as employed by a single employer *and all such trades or businesses as a single employer*." 29 U.S.C. § 1301(b)(1) (emphasis supplied). The MPPAA notice provisions of § 1399 are within Subchapter III, and require only notice to "the employer." Because Congress made no provision to the contrary, an acceptable reading of the statutory language is that because all trades or businesses under common control "shall be treated ... as a single employer," notice to one should be notice to all.

To be sure, a court need not rely on the literal language of ERISA in interpreting its provisions, but may also look to the intent of the statute. *Kosak*, 679 F.2d at 308. The MPPAA was designed "(1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) ... to ensure benefit security to plan participants." H.R.Rep. No. 869, 96th Cong., 2d Sess. 71, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2918, 2939. Liberal construction of the MPPAA's notice provisions in favor of pension funds would be consistent

with both these goals. Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans. *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984); *Rettig v. PBGC*, 744 F.2d 133, 155 (D.C.Cir.1984).

We also note that the Pension Benefits Guaranty Corporation, which ERISA specifically assigned the task of prescribing regulations concerning common control, has directly addressed the notice issue. In promulgating a regulation concerning the calculation of withdrawal liability, the PBGC stated:

> [U]nder ERISA there is a unity of interest in the case of a controlled group of corporations since the entire group is considered to be a single employer for withdrawal liability and other purposes. Therefore, *PBGC believes that a notice of default sent to the contributing entity which is a member of a controlled group of corporations, within the meaning of section 4001(b)(1), constitutes constructive notice to the other members of the same controlled group.* Thus, PBGC finds that section 4219(c)(5)(A) does not require notice to the other members of a controlled group.

Notice and Collection of Withdrawal Liability, 49 Fed.Reg. 22642, 22644 (1984) (Discussion of Public Comments on Final Rule to be codified at 29 CFR § 2644.1–2644.4) (emphasis supplied). We recognize that because this statement by the PBGC was not promulgated as part of a regulation, and is merely a general statement of policy, it is therefore due little deference. *Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33, 39–40 (D.C.Cir.1974). Nonetheless, we find its reasoning persuasive.[6]

Finally, the only other court to consider this specific issue has determined that on facts essentially identical to those present-

---

6. We recently adopted the PBGC's reasoning in holding that notice to a subsidiary corporation constituted notice to its parent. *United Retail &*

*Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 132 n. 3 (3d Cir.1986).

ed here notice to an employer constituted notice to all other members of a controlled group. *Connors v. Calvert Development Co.*, 622 F.Supp. 877 (D.D.C.1985). In *Connors*, because the employer had defaulted under 29 U.S.C. § 1399(c)(5) by not responding to the fund's notice and demands, the court therefore assessed liability against all other members of the controlled group, even though they had not been provided separate notices of liability. The court stated:

> It is clear that notice and demand to one is notice and demand to all. Defendants' position that Section 1301(b)(1) should read to mean that all entities of the common control group be afforded the same procedural rights as the withdrawn employer must fail. Indeed, such an interpretation would void that section of any significance.

*Id.* at 881–82.

We agree. A fund can only be expected to provide notice to the corporation that is the ostensible employer of the fund's participants. A pension fund has no way of knowing the ownership of a closely held corporation, such as B & W and Sentinel. Holding the fund responsible for providing notice to all other possible entities that might subsequently be deemed to be in a controlled group with the employer corporation would place the fund in an untenable position. In contrast, the stockholders and officers of corporations such as Sentinel and B & W certainly are aware of their holdings. If they choose to ignore Sentinel's potential liability as a member of a controlled group under the MPPAA, then they should suffer the consequences if that issue is subsequently determined adversely to them. Deeming Sentinel to have received notice and therefore subsequently to have defaulted on its payment obligation would cause the full amount of withdrawal liability, as determined by the Plan, to become due.[7]

**B.**

■ Sentinel relies heavily upon this court's holding in *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290 (3d Cir.1982), arguing that *Republic Industries* mandates the suspension of the running of MPPAA's period for requesting arbitration until its status as an employer is resolved first in federal court. Yet in *Republic Industries*, we emphasized that the facial constitutional challenge of the statute presented there was an "unusual" situation, where administrative review by an arbitrator was not helpful, and that the exhaustion of administrative remedies was therefore not required. *Id.* at 298. This court confirmed that in less compelling circumstances, "the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes should be respected." *Id.* at 294–95. Because Sentinel's contention that it is not an employer of B & W's employees under the MPPAA does not even remotely approach the significance of a constitutional challenge, *Republic Industries* does not justify suspending the MPPAA's limitation period for requesting arbitration.

Furthermore, Republic had brought an action to enjoin imposition of liability prior to the expiration of the MPPAA's ninety day period for requesting review by a fund of withdrawal liabilities. *Id.* at 292. Here, Sentinel may have successfully sought such a decree prior to imposition of liability upon B & W. *See, e.g., Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund*, 580 F.Supp. 1457 (S.D.N.Y.

7. We note that recently this court held unconstitutional the presumption of correctness given a fund's calculation of withdrawal liability in a subsequent arbitration. *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3d Cir.1986). However, we struck down only the section of the MPPAA that established the presumption, 29 U.S.C. § 1401(a)(3)(A), "leaving the rest of MPPAA fully operative." *Id.* at 144. Because we hold that Sentinel failed timely to request arbitration, the degree of deference an arbitrator must provide a fund's withdrawal liability calculation is not involved. *Yahn & McDonnell* therefore has no effect on our holding in this case.

1984); *T.I.M.E.–DC v. New York State Teamsters Conference Pension & Retirement Fund,* 580 F.Supp. 621 (N.D.N.Y.), aff'd, 735 F.2d 60 (2d Cir.1984). However, Sentinel instead chose to do nothing. Its inaction should not now be rewarded.

### C.

At oral argument it was suggested that a potential member of a controlled group with an employer who has withdrawn from a multiemployer fund faces a dilemma: it is required to observe the two statutory requirements of making the interim payments required by 29 U.S.C. § 1399(c)(2), and making a timely challenge to the liability amount; or to chance that the defaulting employer will make the payments and the challenge. If it does not comply with the payment and challenge requirements, and is subsequently determined to be a member of a controlled group, it will be deemed to have defaulted and to have waived the challenge to the liability amount.

We believe that several courses of action are available to avoid the horns of this purported dilemma. The corporation could admit its status as a member of the controlled group, request review and arbitration of the withdrawal liability and make the required payments. If the corporation's membership in a controlled group with the withdrawing employer is clear, and it is likely that the withdrawing employer is insolvent, this course of action will at least save the corporation costs of litigating an action such as this, while also affording it the opportunity for review and arbitration. Another avenue is available. The putative member of the controlled group could seek to compel the withdrawing employer, the alleged corporate sibling, to request review and arbitration itself and to make the interim payments required during those proceedings.

Moreover, a third course is available. If the corporation legitimately believes its status as a controlled group member is doubtful, it could bring a declaratory judgment action to have that question resolved by a federal court. In such a proceeding, the corporation could request that the court enjoin the running of the statutory period for seeking review and arbitration. *See, e.g., Republic Industries,* 693 F.2d at 292. We see nothing to prevent the corporation from requesting review by the fund and arbitration and making the interim payments to the fund contingent upon the outcome of the declaratory judgment action. If the federal court later decided that the corporation was not a member of the controlled group, it could order the fund to return the payments.

These possible courses of action have the advantages of preserving review and arbitration, yet avoiding default by the potential member of a controlled group. A remaining course of action is not as satisfactory. That is to do nothing. If a corporation follows this course, it gambles that it will not later be found to be a member of a controlled group with the withdrawn employer. It also risks losing the possibility of review and arbitration and risks default. This is precisely what Sentinel did here. When a corporation chooses this latter course the result, though seemingly harsh, is but a self-inflicted wound.

Because so many other satisfactory options are available to a corporation, we are persuaded that what appears superficially to be a dilemma is not so. The result we reach here is neither onerous, nor inconsistent with the objectives of ERISA and the MPPAA—maximum protection of pension plan participants. Sentinel gambled and lost. It hoped that it would not be subsequently deemed a single employer along with B & W under a controlled group theory. The facts were found against it and it must now pay the price.

■ Accordingly, we conclude that the district court erred in determining that Sentinel did not receive notice of withdrawal liability until the court's January 18, 1984 order concluding that Sentinel was a member of a controlled group with B & W. Sentinel received constructive notice of its withdrawal liability when B & W was notified on September 1, 1982. The statutory periods for requesting the Fund to review

130

that liability, under 29 U.S.C. § 1399(b)(2), and for subsequently requesting arbitration under § 1401 have therefore expired. Sentinel will be deemed to have waived these statutory rights and defaulted under § 1399(c)(5). Sentinel is liable for the entire amount claimed by the Plan—$168,871.00.

### VII.

We therefore restate our conclusions. We conclude that B & W's cross-appeal is untimely. We further conclude that the district court properly decided that Sentinel and B & W were members of a controlled group. We will therefore affirm the district court's judgment that Sentinel is liable for B & W's delinquent payments to the Fund. We also conclude that the district court erred in determining that notice to one member of a controlled group does not constitute notice to other members of the group. We will therefore reverse the judgment of the district court and remand these proceedings for the purpose of entering a final order in accordance with the foregoing.