**In re MUSHROOM TRANSPORTATION COMPANY, INC. Jointly Administered With: Penn York Realty Company, Inc., Leazit, Inc., Robbey Realty, Inc., and Trux Enterprises, Inc.**

Bankruptcy No. 85–02575F.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 25, 1988.

Michael J. Reed, Paoli, Pa., for Estate of William G. Cutaiar, a shareholder.

William A. Slaughter, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Robert G. Cutaiar, a shareholder.

Jonathan H. Ganz, Pincus, Bressler, Hahn, Reich & Weinberg, Philadelphia, Pa., for debtor, Mushroom Transp. Co., Inc.

Paul Silverstein, Booth, Marcus & Pierce, New York City and Kenneth F. Carobus, Morris and Adelman, P.C., Philadelphia, Pa., for Creditors' Committee.

Kent Cprek, Sanford G. Rosenthal, Sagot & Jennings, P.C., Philadelphia, Pa., for Teamsters Pension Trust Fund of Philadelphia and Vicinity.

## MEMORANDUM

BRUCE I. FOX, Bankruptcy Judge:

This action involves the determination of the validity of a claim against a chapter 11

debtor, Robbey Realty, Inc., for withdrawal liability to a multi-employer pension fund pursuant to 29 U.S.C. §§ 1301, 1381 and 1399. The claimant has moved for summary judgment under Fed.R.Civ.P. 56 and for the reasons set forth below the motion will be granted.

## I.

The procedural and factual background of this contested matter is as follows:

Robbey Realty ("Robbey"), a closely held corporation, filed a chapter 11 petition on June 25, 1985. Robbey, which is wholly owned by members of the Cutaiar family or their heirs, formerly held and leased property to Mushroom Transportation Co. ("Mushroom") for the operation of the latter company's trucking business. Mushroom, a corporation in which the Cutaiar family holds a substantial percentage of the stock, also filed under chapter 11 on June 24, 1985. The two cases were ordered jointly administered along with the cases of Penn York Realty Co., Inc. ("Penn York"), Leazit, Inc., and Trux Enterprises. Trux and Leazit are wholly owned subsidiaries of Mushroom.

For several years, Mushroom, as an employer, had contributed as obligated to the Teamster's Pension Fund ("Fund"), under the terms of its collective bargaining agreement with its union. By January 10, 1986, however, Mushroom had ceased its trucking operations and no longer made any contributions to the Fund.

In this motion for summary judgment, filed on August 21, 1987, the trustee for the Fund requested that Robbey be found liable to the Fund for the obligations of Mushroom. The Fund contends that pursuant to §§ 1381 and 1399 of the Multiemployer Pension Plan Act, Robbey, as a corporation under common ownership and con-

trol with Mushroom, as provided in § 1301, should be held liable for certain vested but unfunded employee benefits arising as a result of Mushroom's cessation of business and withdrawal from the Fund.

The Estate of William Cutaiar, as a major shareholder and creditor of Robbey, filed an answer disputing that Robbey is responsible for Mushroom's liability to the Fund; in this regard it challenges the Fund's calculations of stock holdings of Mushroom in its analysis of common control. After a hearing on October 21, 1987, the parties were given the opportunity to file supplemental briefs. The Estate then submitted records calling into question the accuracy of the Fund's figures regarding stock ownership of Mushroom. Subsequently, in response to the Court's interrogatories, the parties met but were unable to stipulate to certain additional facts. The Fund then submitted a deposition taken from Michael Arnold ("Arnold"), a vice-president of Mushroom, that amended its initial figures to the extent that they were similar as those advanced by the Estate. The movant Fund is now relying on the figures given in the Arnold deposition.[1]

The gist of the Fund's argument is that the Fund is a multiemployer plan as defined in § 1301(a) of ERISA. Mushroom incurred withdrawal liability under § 1381 when it failed to make contributions to the plan after January 10, 1986. Robbey's alleged liability stems from § 1301(b)(1) which provides that "all employees of trades or businesses (whether or not incorporated) which are under *common control* shall be treated as employed by a single employer and all such trades and businesses as a single employer." (emphasis added). The statute further provides that Treasury Regulations found at 26 C.F.R. § 11.414(c) are to be used to determine whether "common control" exists. These

---

1. All parties in interest correctly attach considerable importance to the resolution of this dispute. Mushroom has relatively few assets to be distributed to creditors. Robbey, by contrast, owns valuable real estate and has relatively few creditors. If the Fund prevails then the creditors of Robbey and the other creditors of Mushroom will receive little through the administration of this case. If the Fund cannot assert a

claim against Robbey then, at a minimum, the current creditors of Robbey may look to its realty for payment. The official creditors' committee of Mushroom stated, though, that it would then seek to substantively consolidate the Mushroom and Robbey assets. *See generally, In re F.A. Potts Co., Inc.,* 23 B.R. 569 (Bankr.E.D. Pa.1982).

regulations set forth rules for determining common control based on percentages of stock ownership for each individual corporation, as well as the common identity of the shareholders of the companies in question.[2]

## II.

Before turning to the merits of this dispute, two preliminary matters must be addressed briefly. First, although not raised by either party, a court must always be mindful of its own jurisdiction. In the context of this contested matter, the issue is whether a determination of withdrawal liability must be resolved by arbitration. Just recently, the Third Circuit Court of Appeals emphasized the importance of arbitration in MPPAA, the federal statute governing disputes such as this:

The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1453, was Congress' response to the growing problem of financial insolvencies of multiemployer pension plans. The problem was caused in large part by the ease with which employers could withdraw from such plans, often leaving those plans starving for funds. .... Congress intended MPPAA to discourage such withdrawals and thus ensure the solvency of such plans.... The heart of the Act is its requirement that withdrawing employers pay a substantial withdrawal liability sum to the pension plan, a sum to be calculated without regard either to the net worth of the withdrawing employer or to the continued viability of the plan itself.

At bottom, an employer's withdrawal liability is essentially equal to the employer's allocable share of the plan's unfunded vested benefits, subject to certain adjustments, see 29 U.S.C. § 1381(b) (1982). An employer's allocable share of

these benefits is based primarily on the employer's proportionate share of contributions made to the Fund. See, e.g., 29 U.S.C. § 1391(b) (1982 & Supp. III 1985). The Act provides a series of complex formulas by which a withdrawal liability sum is to be calculated. See § 1391. Given the complexity of the calculations and the many technical issues that must be addressed to assess a bottom line liability, see 29 U.S.C. §§ 1381–1399, Congress has created a system of arbitration designed to resolve most disputes over such determinations. See 29 U.S.C. 1401 (1982). Those disputes that "concern[ ] a determination made under sections 1381 through 1399 of [title 29]" may ultimately be heard in court upon review of an arbitration proceeding, 29 U.S.C. § 1401(a)(1); however MPPAA's primary mandate for these disputes is plain; *abitrate first.* § 1401(a)(1); *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1248–49 (3d Cir.1987).

*Carl Colteryahn Dairy Inc. v. Western Pennsylvania Teamsters and Employers Pension Fund,* 847 F.2d 113, 116–17 (3d Cir.1988) (citations and footnotes omitted).

■ Whether this type of dispute is among those for which arbitration is mandated has been answered by our Court of Appeals. There is a distinction drawn between litigation concerning whether an entity, which has been previously recognized as an employer for MPPAA purposes, is still an employer as opposed to litigation to decide whether an entity "had become a MPPAA employer in time to incur liability for ... withdrawal." *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1250 (3d Cir.1987); *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d 118 (3d Cir.1986). The latter issue need not be resolved by arbitration

2. After years of delay, the temporary regulations set out in 26 C.F.R. § 11.414(c) have given way to permanent regulations. 53 Fed.Reg. 6,603, March 2, 1988. The parties submitted memoranda based upon the temporary regulations. Fortunately, for purposes of resolving this dispute, the permanent regulations affect no significant changes from the temporary regulations. Potentially, the most significant change comes

from the addition of § 11.414(c)–3(f). However, subsection (f), which benefits the Fund, is effective April 1, 1988 while the remainder of the permanent regulation is effective September 2, 1974. I have assumed that subsection (f) has no applicability to the dispute as withdrawal liability is determined as of the date of withdrawal—January 10, 1986.

while the former must be. *Id.* Since the instant contested matter involves the narrow issue of whether Robbey, which had never made MPPAA contributions, is by virtue of MPPAA part of a conglomerate the whole of which is the employer, the dispute is not arbitrable and this court may resolve it. *See Teamsters Pension Trust Fund v. Malone Realty Co.,* 82 B.R. 346 (E.D.Pa.1988).

The second preliminary issue is whether summary judgment is appropriate or whether material facts are in dispute.

Fed.R.Civ.P. 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Fed.R.Civ. P. 56 is made applicable to this contested matter by virtue of Bankr. Rules 7056 and 9014.) This procedural subsection is amplified by Rule 56(e) which states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party.

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also, Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358 (3d Cir.1987); *Sorba v. Pennsylvania Drilling Company, Inc.,* 821 F.2d 200 (3d Cir.1987); *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81 (3d Cir. 1987).

As I noted in *In re Metro Shippers, Inc.,* 78 B.R. 747, 750 (Bankr.E.D.Pa.1987), this procedural rule establishes that:

> the issue for determination on summary judgment is whether the evidence when viewed in the light most favorable to the non-moving party is sufficient for a trier of fact to find all essential elements of that party's case. In marshalling the evidence, the non-moving party is responsible to create an adequate record as to each essential element on which it will bear the burden at trial.

In the instant matter, the Fund has submitted evidence of the stock holdings of shareholders of the various related corporations by way of requests for admissions, affidavits, and depositions. The respondent Estate challenged the accuracy of shareholder figures for Mushroom Transportation, insofar as employee shares were concerned, as of January 10, 1986. While it appeared that both parties were desirous of resolving this dispute by virtue of a motion rather than a trial, I viewed the disparity in employee ownership figures as potentially material and specifically requested that the parties come to some agreement as to the outstanding employee held Mushroom shares as of January 10, 1986.

I view the Fund's response based upon the Arnold declaration as somewhat supportive of the Estate's position. That is, the Fund's initial submission failed to take into account the continued issuance of stock to Mushroom employees between 1983 and January 10, 1986. Conversely, though, the Estate has failed to take into account Mushroom's repurchase of employee stock between its filing for bankruptcy and its withdrawal date, January 10, 1986. The most accurate figures are found in the Fund's supplemental Answer to Court Interrogatory # 5. This response also recognizes that various Cutaiar family members were employees who received stock along with other employees.

Since the Fund is uncertain as to the exact number of outstanding employee shares as of January 10, 1986 and has suggested two figures, 162,580 and 163,428 and as it is the Fund that seeks summary judgment, I have accepted higher figure as the more accurate. I have also accepted, as unchallenged and uncontradicted, the Fund's description of restrictions placed

upon the transfer of Mushroom stock found in both the corporate by-laws as well as the recapitalization plan.[3]

As a result, I agree with the Fund that there are no material disputes and the matter is ripe for summary judgment.

### III.

As a multiemployer pension plan, the Fund is governed by ERISA as amended by the Multiemployer Pension Plan Amendments Act ("MPPAA") (29 U.S.C. §§ 1381 et seq.). Congress enacted the MPPAA to "protect plans from the adverse consequences resulting when individual employers terminate their participation in or withdraw from multiemployer plans." *Pension Benefit Guarantee Corp. v. R.P. Gray & Co.*, 467 U.S. 717, 722, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984). *See Flying Tiger Line v. Teamsters Pension Trust Fund.* MPPAA "addressed this problem by assessing such employers with withdrawal liability, defined in the statute as the employer's adjusted allocable amount of unfunded vested benefits. 29 U.S.C. § 1381(b)(1)." *Flying Tiger Line*, 830 F.2d at 1244.

■ Robbey had few if any employees, as it was a realty holding company. It was Mushroom, with its transportation business, which employed many individuals and which contributed, up until January 10, 1986, to the Fund. Nevertheless, 29 U.S.C. § 1301(b)(1) requires that all trades or businesses (whether or not incorporated) that are under "common control" be treated as though they were a single employer. *Id.* Treating a group of entities as though they were a single employer means that each member of the group is liable for the withdrawal liability caused by any other member. *Id, citing Barker & Williamson.* In order to determine whether entities are un-

der "common control", MPPAA, pursuant to 29 U.S.C. § 1301(b)(1), directs that IRS tax regulations, found at 26 C.F.R. § 11.414(c), are pertinent. *See* 29 C.F.R. § 2612; *Connors v. Calvert Development Co.*, 622 F.Supp. 877 (D.D.C.1985).

The parties differ in the application of these regulations to the facts at hand. To some extent, this is not surprising, for the regulations are convoluted and complex. The purpose of the regulations, though, is to implement a statutory scheme that multiemployer pension plans should not be undermined by one corporation subdividing into smaller interrelated units which would insulate assets of the combined whole from liability. *Cf. United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1981) (discussing regulations in the tax contest). The treasury regulations represent an attempt to articulate objective criteria for determining which corporate entities are sufficiently related that each bears responsibility for the whole. In so doing, the regulations require that certain types of shareholders be treated as holding stock on behalf of another individual ("attribution rules") and that certain types of stock be eliminated from the inquiry ("disqualification rules").[4] The following is simply an analysis, largely focusing on the Mushroom stock ownership, pursuant to the treasury regulations, to determine whether "common ownership" between Robbey and Mushroom exists. To the extent common ownership is found, then withdrawal liability must be assessed against Robbey. The Estate views this result as improper, in that Robbey had virtually no employees, and certainly no Teamster employees. I respectfully disagree. Various decisions make clear that, if "common control" exists so does withdrawal liability. *Teamsters Pension Trust Fund v. Malone Realty Co.* (withdrawal liability imposed upon a closely held realty

---

**3.** Thus, I do not pass upon the Fund's assertion that the Estate is bound by an admission that outstanding employee stock was only approximately 145,000 shares or the Estate's request to be freed of that admission. *See* Fed.R.Civ.P. 36(b).

**4.** The word "eliminate" is inexact. While certain types of stock are disqualified, the very act of disqualification may, as it does here, affect whether corporations are under "common control."

company).[5]

■ The framework within which this dispute shall be resolved is provided largely by 26 C.F.R. § 11.414(c)–2. § 11.414(c)–2(c) defines a "brother-sister[6] group of businesses under common control" as follows:

(c) *Brother-sister group of trades or businesses under common control*—(1) *In general.* The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)–4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

The two key terms are "controlling interest" and "effective control." The former, "controlling interest" is defined in § 11.414(c)–2(b)(2)(A) to mean:

(2) *Controlling interest defined*—(i) *Controlling interest.* For purposes of paragraphs (b) and (c) of this section, the phrase "controlling interest" means:

(A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.

"Effective control" is defined by § 11.414(c)–2(c)(2)(i):[7]

(2) *Effective control defined.* For purposes of this paragraph, persons are in "effective control" of an organization if—

(i) In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporations.

In determining whether both effective control and a controlling interest exist, courts are to consider the status of the putative brother sister corporations as of the date withdrawal liability would arise—that is, the date that the contributing entity withdrew from the pension fund. *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.,* 788 F.2d at 123. As Mushroom ceased operating and withdrew from the Fund on January 10, 1986, that is the relevant date for deciding the questions of common control.

To summarize the narrow issue before me, Robbey and Mushroom will be considered one and the same employer for the purpose of assessing withdrawal liability under MPPAA if they fit within the definition of a brother-sister control group. This will occur if five or fewer individuals own at least 80% of the voting stock, or 80% of the total value of the shares of all classes of both Mushroom and Robbey, and if the same five or fewer individuals are owners of more than 50% of the total voting stock or 50% of the total value of all classes of

5. The Estate's reliance upon § 11.414(c)–3(d)(7) which defines "control" is misplaced. This definition concerns *only* control of "exempt organizations". No party has suggested that Robbey is an exempt organization.

6. All parties agree that the only possible common control theory is that Mushroom and Robbey were brother-sister corporate entities.

7. Again, all parties agree that these two mathematical formulae do not consider outstanding treasury stock, non-voting stock preferred as to dividends, and non-issued stock. § 11.414(c)–3(a).

stock of both Robbey and Mushroom, "only to the extent such ownership is identical with respect to each such organization."[8] Furthermore, to the extent the Fund argues that the Supreme Court interpretation of "controlling interest" (the 80% test) in *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982) should be limited to tax issues, I respectfully disagree; the permanent regulations state that their provisions were redrafted with *Vogel* in mind, and there is nothing in MPPAA to suggest that these tax regulations should not be interpreted as written. As a result, in order to be part of the controlling interest group an individual must have an ownership interest in each of the putative brother-sister corporation. *Vogel.*

Before turning to the corporate ownership interests, there is one further point. The Fund has asserted, the Estate has not challenged, and so I will thus accept that the value of the shares is represented by the summation of the common stock, Class A (which is non-voting) and Class B (which is the only voting stock).[9]

I now turn to the stock ownership.

## IV.

There are three corporations whose stock ownership must be detailed, as of January 10, 1986. First is Robbey Realty:

*Robbey Realty Ownership* [10]

| | Voting Stock | Non-Voting Stock |
|---|---|---|
| Robert G. Cutaiar | 33⅓% | 33⅓% |
| Richard W. Cutaiar | 33⅓% | 33⅓% |
| Mary P. Peach | 16⅔% | 16⅔% |
| Joseph C. Cutaiar | 8⅓% | 8⅓% |
| William W. Cutaiar, III | 8⅓% | 8⅓% |

Before turning to Mushroom's stock ownership, some of Mushroom's stock is owned by another Cutaiar company called Penn York. The parties agree that shareholders of Penn York for its only class of shares were originally as follows:

*Penn York Shareholders*

| | |
|---|---|
| Mushroom Transportation | 200 shares |
| RFC Trust | 238⅔ shares |
| Richard W. Cutaiar | 102⅔ shares |
| William W. Cutaiar, Jr. | 238⅔ shares |

Prior to his death, William W. Cutaiar, Jr. agreed to have his stock redeemed. The parties recognize that not all redemption sums were paid to the Estate prior to this bankruptcy filing, but have treated the Penn York shares as if they were fully redeemed.[11] Thus, on January 10, 1986, the Penn York owners were:

| | |
|---|---|
| Mushroom | 200 shares |
| RGC (via the RFC Trust) | 238⅔ shares |
| Richard W. Cutaiar | 102⅔ shares |

Turning now to the Mushroom shareholders, there are so many attribution rules to apply (i.e. spouse to spouse; child to parent) that a step by step analysis would be unwieldy. I do note that the Estate does not contest the Fund's analysis; thus, I shall accept the Fund's Exhibit 1, supplemental submission, as accurate. This exhibit though shall be modified to also indicate the Class A common stock holdings:

---

8. For example, if individual A owns 40% of the voting stock of corporation X and 20% of the voting stock of corporation Y, his "effective control" of *both* corporations is 20%.

9. Even if I were to consider the preferred stock, Classes A + B, the small number of shares (combined non-treasury shares are less than 27,-000); *see* Fund memorandum at 6) would have little effect upon the outcome.

10. This listing assumes the application of various attribution rules which the parties agree are *relevant and not controverted.* The RGC ownership interest is derived from a trust created by his father, Robert F. Cutaiar. The ownership of

MPP, JCC, and WWC III is derived from the nominal ownership in Robbey by the Estate of William W. Cutaiar, Jr. (which is challenging the Fund in this litigation). The attribution rules are set out in 26 C.F.R. § 11.414(c)–4(b)(3).

11. I appreciate this position reflects a reasonable desire to simplify what is already a dispute more complex than the nature of the issue should require. I also note that as the beneficiaries of the Estate would be considered the owners of any unredeemed stock, and as I (unlike the Fund) view them as part of the control group, the Estate is not adversely affected by this simplification.

*Mushroom Stockholders as of January 10, 1986*

| | Common B (Voting) | % | Common A (Non-Voting) | % |
|---|---|---|---|---|
| **R.G. Cutaiar** | | | | |
| Custodial | 0 | | 13,572 | |
| RFC Trust | 59,439 | | 7,794 | |
| Employee Plan | 1,000 | | 0 | |
| Penn York Reattribution | 36,382 | | 0 | |
| | 97,021 | 27.91 | 21,366 | 40.72 |
| **R.W. Cutaiar** | | | | |
| Personal | 60,996 | | 1,939 | |
| Employee Plan | 1,000 | | 0 | |
| Penn York Reattribution | 15,645 | | 0 | |
| M.F. Cutaiar (wife) | 1,035 | | 0 | |
| | 78,676 | 22.63 | 1,939 | 3.70 |
| **Jacques R. Cutaiar** | | | | |
| Personal | 4,072 | 1.17 | 0 | |
| **R.B. Cutaiar** | | | | |
| Personal | 1,357 | | | |
| Employee Plan | 1,000 | | | |
| | 2,357 | .68 | — | |
| **Kenneth J. Cutaiar** | | | | |
| Personal | 1,357 | | | |
| Employee Plan | 350 | | | |
| | 1,707 | .49 | | |
| **James R. Cutaiar** | | | | |
| Employee Plan | 413 | .12 | | |
| **Mary P. Peach** | | | | |
| Personal | 0 | 0 | 2,094 | |
| Custodial | 0 | 0 | 1,745 | 7.32 |
| | | | 3,839 | |
| **William Cutaiar, III** | | | | |
| Custodial | 0 | 0 | 1,745 | 3.33 |
| Other Employee | 163,428 | 47.0 | 0 | |
| Others | — | | 25,327 | 48.27 |
| **Totals** | 347,674 | | 52,465 | |
| **Excluded Treasury Stock** | | | | |
| RFC Sales Agent Escrow | 4,072 | | | |
| Employee Option | | | | |
|   Jacques Cutaiar | 1,000 | | | |
| Other Retirees | 16,638 | | | |
| Disability | 507 | | | |
| Penn York Reattribution | 30,490 | | | |

The attribution of the Penn York stock in Mushroom, which amounted to 82,517 shares on January 10, was attributed to the shareholders of Penn York in proportion to their Penn York holdings. *See* 26 C.F.R. § 11.414(c)–4(b)(4). Of course, since Mushroom holds stock in Penn York and Penn York holds stock in Mushroom, I have accepted the Fund's suggestion (not challenged by the Estate) that the Gordian knot should be cut by attributing Mushroom's portion of Penn York stock to treasury stock. (I have not applied § 11.414(c)–3(f) which might prevent the attribution to Treasury stock, and thus benefit the Fund, as this subsection is only effective April 1, 1988. In contrast, the remainder of the permanent regulations are effective January 1, 1974.)

The nub of the dispute involves the employee shares. Obviously, as employees hold 47% of the voting shares, the 80% "controlling interest" could not be met by five or fewer individuals who own Robbey shares. The Fund, though, argues that these employee shares must be excluded from the common control analysis. Unfortunately for the Estate, I must agree.

## V.

■ Additional regulations provide that employee stock holdings are eliminated from the brother-sister control group analysis in certain circumstances. First, § 11.414(c)–3(c)(i) states that if five or fewer persons own at least 50% of the voting power or value of the entity which has issued employee held shares then the exclusion provision of § 11.414(c)–3(c)(iii) applies.[12] Subsection 3(c)(iii) states that employee stock is not figured in the computations if it is substantially restricted by reason of limitations on employee rights to dispose of the stock which run in favor of the corporation or the common owners. Substantial restrictions are defined in subsection (d)(6)(i) to include a right of first refusal or a prohibition against disposal without the consent of another. Subsection (d)(6)(ii), however, sets forth a special rule removing stock subject to reciprocal restrictions from the (c)(3) exclusionary rule.

Quickly looking at the Mushroom shareholder figures, it is readily apparent that R.G. Cutaiar and R.W. Cutaiar own 50.54% of the voting shares. In addition, four of the individuals who control Robbey (everyone but Joseph C. Cataiar, who is not disclosed as having any interest in Mushroom) own 51.13% of the value of all shares. Thus, the first step in the employee exclusion process is met. The second step under 3(c)(iii) is also applicable.

Prior to 1986, MPPAA referred to the regulations accompanying I.R.C. § 1563 to determine questions of common control. However, because the regulations §§ 414 and 1563 address the same issue and use substantially the same wording in defining substantial restrictions on employee holdings, the cases interpreting substantial restrictions under § 1563 still furnish a guideline for the use of this term under the § 414 regulations.

Generally, a right of first refusal running in favor of the employer has been held to be a substantial restriction on employee held stock. *Mid America Industries, Inc. v. United States*, 477 F.2d 1029 (8th Cir. 1973); *Barton Naphtha Co. v. Commissioner*, 56 T.C. 107 (1971). The rationale for these holdings is that employers should not be able to avoid the application of the common control theory by divesting themselves of sufficient stock to neutralize it for this purpose, but, "without, as a practical matter, divesting themselves of the benefits of ownership of a corporation." *Barton Naphtha*, at 115 (citing H.Rep. No. 749, 88th Cong., 1st Sess. (1963)).

In this vein, the regulations at 11.414(c)–3(d)(6)(ii) additionally provide that stock subject to bonafide reciprocal restrictions are not to be excluded from the computations. The court in *Superior Beverage Co. of Marysville, Inc. v. Commissioner*, 525 F.2d 186 (9th Cir.1975) framed the reciprocity requirement for inclusion of the stock as whether the common owner was restricted to the same degree as other shareholders in disposition of the stock.

In the case of the Mushroom shareholders, all stock issued to employees under the recapitalization program, whether issued to members of the Cutaiar family or the rank and file employees, was subject to right of first refusal by the company. In practice, employees generally tendered, and the company redeemed, employee shares at retirement. Presumably, this limitation extended to shares held by members of the Cutaiar family.

In addition to the right of first refusal, however, the by-laws of Mushroom provided that any major shareholder, defined as a 10% shareholder, could buy the shares of a minor shareholder, but that only Mushroom could buy the shares of a major shareholder. The employee shares, therefore, were

---

**12.** This requirement, though worded similarly to the "effective control" test, differs slightly.

essentially subject to a right of second refusal (should Mushroom for some reason not redeem their stock) running in favor of the major shareholders. This restriction, however, was not reciprocal; employees as minor shareholders did not possess the same privilege in regard to shares held by the common owners. In effect, this right of second refusal allowed the Cutaiar family to divest itself of actual ownership of the shares while retaining "as a practical matter, the benefits of ownership," *i.e.*, the right to repurchase the stock and prevent shares from being sold to third parties and eroding the Cutaiar family's control of Mushroom. The Cutaiar major shareholders were subject to no similar restrictions running in favor of employees or other minor shareholders, leading to the conclusion that employee shares were subject to substantial restriction and should not be included in the computations for determining common control.

■ The elimination of the employee shares is the critical step in concluding that a brother-sister corporate relationship exists between Robbey and Mushroom. Both a controlling interest and effective control exist for four individuals who own some interest in Robbey and Mushroom as required by the Supreme Court in *Vogel.*

| | Robbey Voting + Value | Mushroom Voting | Value |
|---|---|---|---|
| Robert G. Cutaiar | 33⅓ | 52.66% | 50.01% |
| Richard W. Cutaiar | 33⅓ | 42.70% | 34.06% |
| Mary P. Peach | 16⅔ | 0 | 1.62% |
| William W. Cutaiar, III | 8⅓ | 0 | .74% |
| Total | 91.83% | 95.36% | 86.43% |

Applying the "controlling interest" test, the four named individuals [13] own more than 80% of the value and of the voting power of Robbey and Mushroom. Applying the "effective control" standard, these four individuals have 66⅔% voting power and 69.02% of the value, (recognizing that the lesser of the individual's ownership interest in the two entities must be considered).[14] Thus, they meet the greater than 50% threshold.

With both prongs of the brother-sister group control test satisfied, Mushroom and Robbey Realty are considered to be under common control and as one employer for purposes of MPPAA. Robbey is therefore jointly liable to the Fund for the withdrawal liability incurred by Mushroom. The extent of this liability though must be determined under the arbitration provisions of MPPAA (unless the parties agree as to its amount). *See Flying Tiger Line.*

An appropriate order will be entered.

---

**13.** I disagree with the Fund to the extent it suggests that RGC and RWC only make up the control group.

**14.** As I interpret *Vogel,* if Mary Peach and William W. Cutaiar, III owned no interest in Mushroom no brother-sister relationship could be found, since the 80% controlling interest test would not be met.