John P. O'CONNOR, Raymond H. Baker, James M. Beros, William M. Cherilla, Richard Glass, Nicholas A. Sansotta, Jerry A. Davis, William J. Dillner, Jr., James H. Hutchinson, Jr., and Joseph E. Zaucha, Trustees of the Western Pennsylvania Teamsters and Employers Pension Fund, Plaintiffs,

v.

DeBOLT TRANSFER, INC., DeBolt–Somerset Bus Co., Inc., Steel Valley Trucking, Inc., Al–O–Mon Terminals, DeBolt Realty Co., Inc., Defendants.

Civ. A. No. 85–1826.

United States District Court, W.D. Pennsylvania.

May 21, 1990.

Vincent P. Szeligo, Wick, Streiff, Myer, Metz & O'Boyle, Pittsburgh, Pa., for plaintiffs.

Thomas D. MacMullan, MacMullan & Associates, P.C., Pittsburgh, Pa., for DeBolt Transfer, Inc., DeBolt Realty, Inc., Steel Valley Trucking, Inc., and Al-O-Mon Terminals.

Templeton Smith, Jr., Rose, Schmidt, Hasley & DiSalle, Pittsburgh, Pa., for De-Bolt–Somerset Bus Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

SIMMONS, District Judge.

### FINDINGS OF FACT

1. That DeBolt Transfer, Inc. was properly a party to the collective bargaining agreement between it and the Teamster's Locals 249 and 261, (AFL–CIO) and was required by said agreement to make contribution for its employees into the Western Pennsylvania Teamsters and Employers Pension Fund. (Transfer's obligation to contribute to the Fund is well known since this Court previously interpreted the language of Transfer's collective bargaining agreement in a decision upheld by the Third Circuit in *Byrnes, et al. v. DeBolt Transfer,* 741 F.2d 620 (3d Cir.1984)).

2. "Withdrawal liability" owed to the Plaintiff Pension Fund in the amount of $355,108.00, was assessed against DeBolt Transfer, Inc. ("Transfer") by a demand letter dated March 17, 1984, as later amended.

3. "Transfer" acknowledged receipt of the demand letter and the amended demand and did not respond in any way to the Plaintiff's demand and did not demand arbitration as provided by law. (See 29 U.S.C. Sections 1399, 1401, and 1451).

4. Mrs. Sara DeBolt has common ownership of all five of defendant companies.

5. Mrs. Sara DeBolt, as owner of Defendant DeBolt Transfer, Inc. had constructive knowledge of the amount of "withdrawal liability" assessed against her company, Defendant DeBolt Transfer, Inc.

6. Because Sara DeBolt as a matter of fact is the common owner of the other four

defendant corporations, namely, DeBolt–Somerset Bus Co., Inc.; Steel Valley Trucking, Inc.; Al–O–Mon Terminals; and De-Bolt Realty Co., Inc., at all relevant times, she had constructive notice of the "withdrawal liability" proceedings involving De-Bolt Transfer, Inc.

7. Defendant DeBolt Transfer, Inc. stopped contributing to the Plaintiff Pension Fund on April 1, 1982.

### CONCLUSIONS OF LAW

1. Mrs. Sara DeBolt's common ownership of all five of the Defendant companies meets the legal requisite of the "controlled group" test for the assessment of withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") (29 U.S.C. Sec. 1381 *et seq.*), amending the Employee Retirement Income Security Act of 1974 ("ERISA").

2. All of the defendants are members of a "controlled group" and are jointly and severally liable for the withdrawal liability incurred by DeBolt Transfer, Inc. (The term "controlled group" is defined in ERISA at 29 U.S.C. Sec. 1301(b)(1) and interpreted by the Pension Benefit Guaranty Corporation in regulations at 29 C.F.R. para. 2644.)

### OPINION

This action arises out of an assessment of withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") (29 U.S.C. Section 1381 *et seq.*), amending the Employee Retirement Income Security Act of 1974, ("ERISA"). The Fund filed the instant Complaint for Collection of Withdrawal Liability seeking the recovery of withdrawal liability from DeBolt Transfer, Inc. ("Transfer") due to its complete withdrawal from the Fund. The Fund further seeks to establish joint and several liability against the remaining

Defendants, DeBolt–Somerset Bus Co., Inc. ("Bus"), Steel Valley Trucking, Inc. ("Steel"), Al–O–Mon Terminals ("Terminals") and DeBolt Realty Co., Inc. ("Realty") because they are members of a controlled group with Transfer, as that term is defined by ERISA at 29 U.S.C. Sec. 1301(b)(1) and interpreted by the Pension Benefit Guaranty Corporation in regulations at 29 C.F.R. Para. 2644.

Undoubtedly the Fund is entitled to judgment against Transfer because Transfer had an obligation to contribute to the Fund and upon the cessation of that obligation to contribute in April, 1982, it incurred a complete withdrawal within the meaning of MPPAA and was assessed withdrawal liability. *See* 29 U.S.C. Sections 1382 and 1383. The assessment and the calculation of the amount of liability is now fixed and cannot be challenged by any of the defendants because it is undenied that "Transfer" failed to initiate the arbitration remedy provided under MPPAA. *See* 29 U.S.C. Sections 1399, and 1401. The statute and the body of case law unequivocally provides that "Transfer" owes the assessed withdrawal liability, all additional statutory damages, and that it is foreclosed from disputing the liability in this civil collection proceeding.

Since the Fund also seeks recovery from the four other Defendants, it must establish that each is a member of the same controlled group as "Transfer". Upon proof of the undisputable facts showing the requisite level of common ownership, the Fund has met its burden and is entitled to judgment.

Although the defendants were initially evasive and refused to acknowledge controlled group status [1], in a lengthy colloquy during the second and third day of trial, counsel for "Bus" conceded that all of the five defendants met the technical definition

---

1. Contrary to counsel for Bus' claim on the last day of trial it had not disputed its membership in a controlled group, the transcript shows that Bus refused to stipulate to its membership in the controlled group at the opening of trial, as demonstrated in the following colloquy:

Mr. Szeligo [Fund Counsel]; ... those interrogatories contain certain factual information concerning stock ownership which is essential for the establishment of a controlled group. At this point I would like to offer those exhibits into the record, and if there is any possiblity, I would like to ask the defendants to stipulate that all of the named defendants are members of a controlled group of corporations within the meaning of MPPAA.
THE COURT: Do you want to stipulate on that?

of being part of a controlled group by virtue of common ownership of all five defendants by Mrs. Sara DeBolt. Tr. 302–306, 319[2]. However, since the remaining defendant, "Bus" "Steel", "Terminals" and "Realty", throughout the trial refused to concede that they legally fell within the technical definition of controlled group, the Fund presented a preponderance of evidence showing that application of the technical stock ownership test established that all five defendants are members of a controlled group because it is an undenied fact that common ownership of the five defendants was held by one individual, Mrs. Sara O. DeBolt.

Some of the defendants have asserted that even if Transfer is liable and has waived its right to challenge the calculation and assessment, the Fund must show more than a mere technical satisfaction of the controlled group stock ownership test before it can enforce joint and several liability against all defendants for the withdrawal liability triggered by Transfer.[3] However, this is a novel legal theory that has never been applied by any court in any known withdrawal liability decision issued as of this date. There is no authority supporting this position. In fact, defendants come squarely against an impressive body of uniform precedent firmly supporting the Fund's position that the entire controlled group is jointly and severally liable for the withdrawal liability of one member of the group simply because common ownership existed at the requisite level at the time of the withdrawal.

Notwithstanding the fact that "Transfer" was the only defendant which participated in the Fund and was the only defendant identified on the Fund's demand for payment of withdrawal liability, the other defendants, ("Bus", "Steel", "Terminals" and "Realty") had because of common ownership, constructive notice of the assessment and are legally bound by "Transfer's" failure to preserve the statutory right to challenge the assessment in an arbitration proceeding. Liability is fixed and judgment against all defendants is proper.

However, these other four defendants (other than "Transfer"), contend that joint and several liability must be justified by a showing of more than mere common ownership of all five defendants. Defendants argue that Mrs. DeBolt did not exercise actual control and/or active supervision over all five entities. Testimony was presented that she had delegated the responsibility for operating four of the defendants (Transfer, Steel, Terminals and Realty) to one son, John P.M. DeBolt, and that she delegated the responsibility for operating the remaining defendant ("Bus") to her other son, George S.T. DeBolt. Notwithstanding that defendants were able to establish that Mrs. DeBolt was an absentee owner exercising little or no actual control or active supervision over the day-to-day management over "Bus" and "Transfer", there is no legal precedent which would obligate the Fund to prove actual control and/or active supervision by a common owner as a necessary element in establishing the existence of a MPPAA controlled group.

A. "TRANSFER'S OBLIGATION FOR WITHDRAWAL LIABILITY IS FIXED AND THE RIGHT TO DISPUTE THE WITHDRAWAL LIABILITY HAS BEEN WAIVED.

Richard V. Desiderio, Trust Officer of Pittsburgh National Bank, the Administra-

---

MR. SMITH [Bus Counsel]: Your Honor, my name is Templeton Smith for Somerset Bus Company. We will, of course, stipulate that what was said in the answers to interrogatories under oath by our client is factually correct to the best of my knowledge, information and belief, and we will stipulate to those answers. However, I believe, respectfully, that the *question of whether we, DeBolt Somerset, are a member of a controlled group is a legal conclusion and not something to which we can or will stipulate.*

See Tr. 8–9 (emphasis added).

**2.** References to the trial record will be made in this Opinion as follows: "Tr. ____"; Trial Exhibits—"Ex. ____".

**3.** Defendants appear to be essentially arguing for the judicial creation of a novel and unprecedented exception to the MPPAA assessment and collection scheme which this Court does not have authority to judicially legislate.

tive Manager of the Fund, testified in support of the Fund's complaint. Tr. 27–142. Mr. Desiderio testified that he had been involved in the day-to-day functioning and official record-keeping of the Fund since 1961. He testified that he was personally involved and familiar with the Administrative Manager's responsibilities and procedures in assessing withdrawal liability on behalf of the Fund under MPPAA. Tr. 28 and Ex. 15.

Mr. Desiderio explained that the Fund is a multiemployer pension fund covering 10,000 active employees working for 600–625 different employers. He explained that "Transfer" had been one of the contributing employers until it completely withdrew from the Fund on April 1, 1982. Tr. 28–36. As a result of "Transfer's" complete withdrawal, the Fund assessed complete withdrawal liability of $371,736 against "Transfer" through a demand letter dated May 17, 1984. Ex. 1. The Fund's demand letter included an exhibit showing the underlying calculation and allocation of the assessed withdrawal liability and an optional monthly payment schedule. Ex. 2. The demand letter also included an enclosure identifying the exclusive dispute resolution procedure provided under MPPAA for asserting objections against the calculation and/or assessment of liability. Tr. 36–45 and Ex. 9. Mr. Desiderio explained that following the issuance of the Fund's demand letter, a calculation error was identified which led the Fund to reduce its demand from $371,736 to $355,108. Tr. 36–45 and Ex. 6 & 7.

John P.M. DeBolt, President of Transfer, acknowledged "Transfer's" receipt of the Fund's May 17, 1984 letter demanding payment of withdrawal liability, together with the attached material. Tr. 227–236 (acknowledging receipt of Ex. 1, 2 and 9). John DeBolt testified that "Transfer" had received two subsequent letters continuing to demand payment of withdrawal liability

and advising that the assessment had been reduced to $355,108. Tr. 238–239, (acknowledging receipt of Ex. 4 and 6). He also testified that "Transfer" did not respond in any way or demand arbitration. He stated that "Transfer" has not made any payments to the Fund in satisfaction of the assessed withdrawal liability. Tr. 236–239.

Mr. Desiderio explained that in January, 1985, as a result of "Transfer's" failure to pay or respond to the assessment and subsequent notices of delinquency (Ex. 4 and 6), the Fund determined Transfer to be in default. Consequently, "Transfer's" option to repay its liability under the monthly payment schedule was lost and its entire liability was accelerated. As a consequence of this default, "Transfer" became liable for the entire liability, together with interest, liquidated damages and attorney's fees. Tr. 60–71 and Ex. 15.

■ "Transfer's" conscious decision to ignore the Fund's assessment of withdrawal liability was directly addressed by Congress when it provided strict and detailed collection and dispute resolution procedures and remedies in MPPAA. *See* 29 U.S.C. Sections 1399, 1401 and 1451. Where an employer fails to initiate arbitration, the assessing fund's right to file suit to collect withdrawal liability, interest, liquidated damages and attorney's fees accrues and the employer's right to dispute the assessment is waived. Therefore, "Transfer" is estopped from setting forth objections to the assessment. For instance, Transfer may not properly raise a factual argument that it never had a collective bargaining agreement obligating it to contribute to the Fund[4]. Similarly, "Transfer" is estopped from challenging the technical actuarial calculation of its liability. While the waiver of these rights may appear to be a harsh consequence of "Transfer's" inaction and inattentiveness to its rights, this result was

---

4. Transfer's obligation to contribute to the Fund is well known since this Court previously interpreted the language of Transfer's collective bargaining agreement in a decision upheld by the Third Circuit in *Byrnes, et al. v. DeBolt Transfer,* 741 F.2d 620 (3d Cir.1984). In any event, even if there was a basis to this factual dispute,

courts have precluded the interjection of waived factual disputes concerning the existence of collective bargaining agreements in analogous withdrawal liability cases. *See, Robbins v. Admiral Merchants Motor Freight, Inc.,* 846 F.2d 1054, 1057 (7th Cir.1988).

clearly intended by Congress as a key feature of the statutory enforcement scheme for MPPAA.

### 1. *The Statutory Framework For the Assessment And Collection Of Withdrawal Liability*

Congress enacted the withdrawal liability provisions of MPPAA with the ultimate goal of protecting participants and beneficiaries entitled to benefits from multiemployer pension funds. Congress observed the multiemployer pension plans are financially burdened whenever an employer withdraws and permanently ceases to pay contributions. A complete withdrawal, which results from a permanent cessation of contributions, results in a loss of income needed to pay vested beneficiaries. Many multiemployer pension funds have unfunded vested benefit liability, which essentially means that the present value of the obligation to pay vested benefits exceeds the fund's assets.

Since passage of ERISA in 1974, pension funds have been obligated to meet minimum funding standards designed to eventually narrow the gap between assets and benefit obligation. Under the minimum funding standards, pension funds are required to amortize the level of their unfunded benefit liability out of employer contributions. However, where employers terminate their obligation to contribute, the fund can no longer look to that employer's future contributions to amortize its unfunded benefit liability.

MPPAA addressed this problem by providing that when an employer withdraws, it must pay a sum (i.e., withdrawal liability) to the fund which is the employer's pro rata share of the unfunded vested benefit liability of the pension fund. The imposition of withdrawal liability is designed to lessen the harm felt by the pension fund by the loss of the withdrawn employer's future contributions. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 727, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984); *Flying Tiger Lines v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1243-44 (3d Cir.1987).

Even if a withdrawn employer properly raises objections, it is still required to pay installments of its withdrawal liability pursuant to a payment schedule provided by the pension fund. *See Pantry Pride v. Retail Clerks Tri–State Pension Fund*, 747 F.2d 169, 171 (3d Cir.1984). On the other hand, where an employer fails to invoke review and arbitration and fails to pay the installments of its withdrawal liability obligation required under the payment schedule, as "Transfer" has done here, the assessment may be declared to be in "default" within the meaning of 29 U.S.C. Section 1399(c)(5), with the result that the entire sum is accelerated and immediately due and owing under 29 U.S.C. Section 1401(b)(1). *See IUE AFL–CIO Pension Fund et al., v. Barker & Williamson, Inc., et al.*, 788 F.2d 118 (3d Cir. 1986); *Robbins v. Pocket Beverage*, 779 F.2d 351, 353 (7th Cir.1985).

### 2. *Failure to Initiate Review and Arbitration*

An employer who has been assessed withdrawal liability and is dissatisfied with the pension fund's withdrawal liability determination must initiate review proceedings within the timetables set forth in MPPAA. Ultimately, it must take its dispute to arbitration or forego its right to pursue the dispute. See 29 U.S.C. Section 1399(b)(2) and 1401(b)(1).

MPPAA provides that all withdrawal liability disputes between pension funds and employers be resolved through arbitration:

> Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under Sections 4201 through 4219 [29 U.S.C. Sections 1399 and 1401, pertaining to the assessment of withdrawal liability] shall be resolved through arbitration ... 29 U.S.C. Section 1401(a)(1).

MPPAA also establishes strict deadlines for the employer's initiation of arbitration:

> (b)(2) Either party may initiate the arbitration proceeding within a 60 day period after the earlier of:

(A) the date of notification to the employer under section 4219(b)(2)(B) [29 U.S.C. Section 1399(b)(2)(B) ], or

(B) 120 days after the date of the employer's request under section 4219(b)(2)(A) [29 U.S.C. Section 1399(b)(2)(A) ]. 29 U.S.C. 1401(a)(1).

When an employer ignores its arbitration rights, MPPAA unambiguously provides that the liability is fixed and the employer's right to dispute the assessment is waived:

> [i]f no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded by the plan sponsor under section 4219(b)(1) [29 U.S.C. Section 1399(b)(1) ] shall be due and owing on the schedule set forth by the plan sponsor. 29 U.S.C. Section 1401(b)(1).

The mandatory nature of arbitration is firmly established by the numerous courts which have examined the issue. The courts have not been reluctant to find that a nonresponsive employer has forfeited its right to contest the existence or the amount of its assessed withdrawal liability. The courts have unanimously agreed this result is dictated by the clear and unequivocal statutory procedures and remedies contained in MPPAA and emphasized by Congress throughout MPPAA's legislative history. As the Third Circuit has explained, this result, though seemingly harsh, is but a self-inflicted wound. *See IUE AFL–CIO Pension Fund et al., v. Barker & Williamson, Inc., et al.*, 788 F.2d 118, 129 (3d Cir.1986).

Several courts have strictly applied the statutory deadlines and precluded employers from initiating untimely arbitration where the employer did not ignore the assessment, but merely failed to file arbitration within the specific timetables set out in MPPAA. *See Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054 (7th Cir.1988); *Robbins v. B & B Lines, Inc.*, 830 F.2d 648 (7th Cir.1987); *Combs v. Leishman*, 691 F.Supp. 424 (D.D.C.1988); and, *Combs v. Western Coal Corporation*, 611 F.Supp. 917 (D.D.C.1985). Courts have uniformly found that where there are factual disputes, MPPAA requires that those disputes must be timely raised in arbitra-

tion and, if no arbitration is initiated before the period has expired, such disputes cannot be resolved in a civil proceeding. *See T.I.M.E.–DC. Inc. v. Management Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir.1985): and, *New York Teamsters Pension Fund v. McNicholas Transportation Co.*, 848 F.2d 20, 23 (2d Cir. 1988).

In McNicholas, the Second Circuit refused to consider the company's submission of affidavits suggesting the existence of a factual dispute which might have raised a factual defense to the assessment of withdrawal liability. The Court held this defense has been waived. The Court strictly held the employer to the statutory timetable governing the right to pursue arbitration:

> We reject the Company's request that, if we conclude there are factual disputes, we send the parties to arbitration. The Act places a time limitation on the availability of arbitration ... Arbitration is allowed only if the employer's request for arbitration was made within 60 days of the sponsor's response ... As the company concedes, its request for arbitration was not made until 63 days after the Fund's response ... Under the terms of the statute, therefore, since there was no joint request for arbitration, the Company's withdrawal liability has become fixed. *We will not disregard the clear language of the statute in order to relieve the Company of the consequences of its failure to meet the time limitations imposed by the act.* *Id.* at 23.

The Second Circuit's strict and faithful application of its duty to literally follow the unequivocal waiver provisions mandated in MPPAA is most evident upon consideration of the fact that the employer in *McNicholas* missed its arbitration filing date by only three days!

There are several withdrawal liability cases decided by the Third Circuit which evidence the mandatory nature of the arbitration requirement of 29 U.S.C. Section 1401. See *Flying Tiger Lines v. Teamsters Pension Trust of Philadelphia*, 830

F.2d 1241, 1248–49 (3d Cir.1987) and *Warner–Lambert Co., Inc. v. United Retail and Wholesale Employees,* 791 F.2d 283 (3d Cir.1986). In *Warner–Lambert,* in a declaratory judgment proceeding, the Court considered constitutional challenges to the MPPAA arbitration procedure which were not addressed in Third Circuit's earlier decision in the *United Retail & Wholesale Employees v. Yahn & McDonnell,* 787 F.2d 128 (3d Cir.1986), *aff'd by an equally divided Court, Pension Benefit Guaranty Corp. v. Yahn & McDonnell,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (per curiam). The Court agreed that the MPPAA arbitration procedure was mandatory and, aside from the burden of proof issue governed by the *Yahn* decision, was constitutional.

In *Flying Tiger,* the Third Circuit revisited the MPPAA arbitration subject in another declaratory judgment proceeding. The Court recognized that the Supreme Court had affirmed *Yahn* by an equally divided vote. The Third Circuit concluded that MPPAA arbitration was an important requirement of the statutory scheme clearly mandated by Congress and that it must be honored. The Court then noted its decision was in line with other circuits which also emphasized and strictly enforced the MPPAA arbitration requirement. *Id.* 830 F.2d at 1248–49 (citing recent decisions summarized in *Marvin Hayes Lines, Inc. v. Central States Pension Fund,* 814 F.2d 297, at 300 (6th Cir.1987).

All Circuit Courts that have faced the issue of waiver of arbitrable disputes have uniformly honored the congressional scheme requiring the initiation of arbitration, even though a seemingly harsh waiver of the defendant's right to contest the calculation and assessment will result. *See Robbins v. Admiral Merchants Motor Freight,* 846 F.2d 1054, 1057 (7th Cir.1988); *Teamsters Pension Trust Fund v. Allyn Transportation Co.,* 832 F.2d 502, 504 (9th Cir.1987); *Robbins v. B and B Lines,* 830 F.2d 648, 649 (7th Cir.1987); *IAM National Pension Fund v. Clinton Engines Corp.,* 825 F.2d 415 (D.C.Cir.1987); *Grand Union Co. v. Food Employers Labor Relations,* 808 F.2d 66 (D.C.Cir.1987); *IUE AFL–CIO*

*Pension Fund v. Barker & Williamson, Inc.* 788 F.2d 118, 129 (3d Cir.1986) (applying the waiver against a member of the employer's controlled group). Numerous district courts have also been uniform in their interpretation of the arbitration mandate and their application of the resulting waiver of the right to pursue disputed issues. *See DeBreceni v. J.C. Campbell Paper Co.,* Mass.Dist.Ct., No. 84–507–WF, March 7, 1988 CCH Para. 23,750S (company who declined to exercise arbitration waived any arbitration defenses, including those pertaining to application of and amount of liability); *Central States, Pension Fund v. MGS Transp.,* 661 F.Supp. 54 (N.D.Ill.1987) (liability defenses not preserved through arbitration cannot be Litigated); *Robbins v. Braver Lumber and Supply Co.,* N.D. Ill., No. 85–C08332, October 9, 1987, CCH para. 23, 739E, 1987 WL 18557 (employer desiring arbitration bears full burden of initiation, failure to initiate waives all defenses); *DeBreceni v. A.W. Heidke Company,* No. 85–821–C, slip opinion, D.C. Mass. March 10, 1987, 1987 WL 7753; *Trustee of Amalgamated Ins. Fund v. Vi-Mil,* No. 85–Cir. 8424, S.D.N.Y., October 27, 1987, CCH Pension Plan Guide para. 23,741V, 1987 WL 14665; *Connors v. B & M. Coal Co.,* No. 84–514, D.D.C., May 28, 1986, CCH Pension Plan Guide para. 23, 709Y; *Warrior Coal Co., Inc. v. Connors,* 649 F.Supp. 1090 (W.D.Va.1986) (purely statutory interpretation claim permitted prior to arbitration, but "as applied" constitutional challenge's proper forum is arbitration); *Robbins v. Chipman Trucking,* 693 F.Supp. 628 (N.D.Ill.1986), aff'd 848 F.2d 196 (7th Cir.1988); *Combs v. Adkins & Adkins Coal Co.,* 597 F.Supp. 122 (D.D.C.1984); *Western Conference of Teamsters Pension Trust Fund v. F.C. Parson, Inc.,* 5 EBC 2277 (W.D.Wash.1984); *Western Conference of Teamsters Pension Trust Fund v. Arizona Pacific Tank Lines,* 4 EBC 2355 (N.D.Cal.1983); and, *Western Conference of Teamsters Pension Trust Fund v. J.N. Ceazan,* 559 F.Supp. 1210 (N.D.Cal.1983).

In *Teamsters Pension Trust Fund of Philadelphia v. Malone Realty,* 82 B.R.

346, 351 (Bankr.E.D.Pa.1988), the Court held that the employer's failure to either request arbitration or make interim payments made the assessment final. In *Robbins v. Pocket Beverage Co., Inc.*, 779 F.2d 351, 353 (7th Cir.1985), the Seventh Circuit acknowledged that a default "authorize[s] the immediate assessment of all withdrawal liability owing and due, from the date of the first payment" and that a default flowed from the employer's "failure to satisfy the statutorily imposed payment obligation ..." Similarly, in *Combs v. Western Coal Corporation*, 611 F.Supp. 917 (D.D.C.1985), the defendant employer, like the Defendants herein, had not paid any of its withdrawal liability and accordingly, the Court held that under 29 U.S.C. Section 1399(c)(5) the employer was in default and the entire amount of liability was due. *See also, Centennial St. Carpenters v. Woodworkers of Denver*, 615 F.Supp. 1063 (D.Colo.1985); *Sova Outerwear v. Trustees of Amalgamated Cotton Garment and Allied Industries Fund*, 578 F.Supp. 1126 (S.D.N.Y.1984).

"Transfer's" admitted failure to initiate a MPPAA arbitration and the resulting establishment of an undisputable fixed liability presents this Court with a clear case of liability. While it is the Fund's view that courts throughout the nation have followed a consistent and unequivocal view, this observation has also been expressed by many courts themselves. For instance, in *Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054 (7th Cir.1988), the Seventh Circuit upheld a lower court's refusal to allow the development of a factual record and its granting of summary judgment for withdrawal liability in favor of a pension fund. The Seventh Circuit characterized the employer's factual argument as nothing more than a mere smokescreen, involving issues which squarely fell within the arbitration requirement of 29 U.S.C. Section 1401(a)(1). The Seventh Circuit noted that a factual dispute had existed which should have been arbitrated. However, since the employer failed to initiate timely arbitration, the lower court was justified in applying the seemingly harsh waiver remedy "clearly enunciated by the

statute". *Id.* at 1057. The Seventh Circuit commented on the uniformity and clarity of the authority on these points:

> "Courts interpreting Section 1401(a)(1) have been consistent in their conclusions. 'Any dispute over withdrawal liability as determined under the enumerated statutory provisions shall be arbitrated.' *Clinton Engines* 825 F.2d at 417; *Teamsters Pension Trust Fund v. Allyn Transportation Co.*, 832 F.2d 502, 504 (9th Cir.1987); *Robbins v. B and B Lines*, 830 F.2d 648, 649 (7th Cir.1987). The arbitration requirement is not viewed as a jurisdictional prerequisite but rather as an administrative remedy exhaustion requirement. *Clinton Engines* 825 F.2d at 417; *I.A.M. v. Stockton Tri Industries*, 727 F.2d 1204, 1207 (D.C. Cir.1984). ' "Arbitrate first" is indeed a rule Congress stated unequivocally.' *Grand Union Co. v. Food Employers Labor Relations Association*, 808 F.2d 66, 70 (D.C.Cir.1987); *Clinton Engines*, 825 F.2d at 417.
>
> The resounding message is that arbitration is the preferred method for resolving pension plan disputes and that failure to arbitrate will have adverse consequences."

*Id.* 846 F.2d at 1056.

In light of "Transfer's" acknowledgment that it received the Fund's withdrawal liability assessment and consciously decided to do nothing, its fate, although seeming harsh, is dictated by the mandate of Congress. This Court must reject the equitable claim that imposition of liability may be unfair because the employer was unaware of the ramifications of failure to comply with the statute. Ignorance of the law is no excuse. As the Seventh Court explained in *Admiral Merchants:*

> The result is harsh but Admiral cannot claim to have been unaware of the ramification of its failure to comply with the statute. "In short, arbitration reigns supreme under the MPPAA. And the consequences of failing to abitrate pursuant to Section 1401(a)(1), 29 U.S.C. Section 1401(a)(1), '[a]ny dispute concerning the determination made under Sections 1381

through 1399' are clearly enunciated by the statute." *Clinton Engines* 825 F.2d at 422.

> *Id.* at 1057.

As a practical matter, since "Transfer" did not own the buildings and terminals utilized in its operation, the Fund's ability to collect the withdrawal liability triggered by "Transfer's" complete withdrawal depends upon the establishment of joint and several liability against commonly owned and controlled affiliated entities holding assets, including both those having inter-company dealings and those operated separately. Section B of this Opinion will discuss the legal precedent supporting the plaintiff's claim that all five defendants are jointly and severally liable for "Transfer's" withdrawal liability by virtue of their memebership in a controlled group.[5]

### 3. *"Transfer's" Challenges To The Validity of The Fund's Actuarial Determination of Unfunded Liability Is Not Properly Before This Court.*

██ Over the Fund's objections, this Court allowed "Transfer," "Steel", "Terminals" and "Realty" to present evidence challenging the technical validity of the Fund's actuarial calculation of unfunded liability.

Evidence offered to challenge the level of withdrawal liability is clearly an arbitrable dispute and, as such, cannot be raised in this proceeding. Mark C. Griffith, an employee benefit consultant with Griffith and Bennett, Inc., was offered as an expert witness for the purpose of giving his opinion on the Fund's level of unfunded liability. Tr. 143–199. Since Mr. Griffith was not an actuary, the Fund challenged Mr. Griffith's qualification and expertise, as well as his ability to offer an expert opinion on the professional certification of the enrolled actuary who filed the Fund's actuarial statements with Internal Revenue Service. Tr. 152–162.

Mr. Griffith admitted that he was not an enrolled actuary. Nevertheless, he attempted to offer expert testimony concerning the accuracy and reasonableness of the actuarial information set forth on the Fund's actuarial statements (Schedule B to Form 5500). These governmental filings include actuarial certifications that must be made by a professional enrolled actuary. Tr. 153–154. The pension benefit field is a wide area and apparently Mr. Griffith's experience deals only with general areas of pension benefit administration. He admitted he had never worked on a pension fund similar in nature to the Western Pennsylvania Teamsters and Employers Pension Fund. Tr. 155. This fatal flaw became most apparent during Mr. Griffith's direct examination by Attorney MacMullan, where the witness admitted he was unable to provide a definition of withdrawal liability.

> MacMullan: Now, could you define for us, please, what is a definition of withdrawal liability?
>
> Griffith: The withdrawal liability—I don't think that I could define that accurately, so I would prefer not to.
>
> Tr. 170.

In light of Griffith's status who is a non-actuary, his lack of experience in working on pension funds which are similar to the Western Pennsylvania Teamsters and Employers Pension Fund and, most importantly, his unfamiliarity with withdrawal liability, his testimony is entitled to very little weight. Since Mr. Griffith was permitted to testify, the Fund presented testimony through its enrolled actuary, Randee

---

**5.** Frequently, the courts evaluate controlled groups having economic relationships and inter-company dealings; naturally, these facts are cited in their decisions. *See e.g. United Food and Commercial Workers v. Progressive Supermarkets,* 644 F.Supp. 633 (D.N.J.1986) (separate operating company and real estate holding company are a controlled group); *Pension Benefit Guaranty Corp. v. Center City Motors,* 609 F.Supp. 409, 412 (S.D.Cal.1984) (employer cannot insulate self from withdrawal liability by vesting ownership of real estate in other entities and then lease back those assets to the underlying business); *Teamsters Pension Trust Fund of Philadelphia v. Malone Realty Co.,* 82 B.R. 346, 350 (Bankr.E.D.Pa.1988). However, controlled group liability does not require any showing of economic relationship or inter-company dealing. *See Western Conference of Teamsters Pension Fund v. Lafrenz,* 837 F.2d 892, 894–5 (9th Cir.1988) (controlled group liability does not require that entities be economically related).

W. Sekol, E.A., M.A.A.A., for purposes of rebuttal. Tr. 371–476.

Mr. Sekol holds the necessary professional accreditations required for the certification of actuarial statements required on Schedule B to Form 5500. Tr. 372–373. Mr. Sekol was present during Mr. Griffith's testimony. He identified numerous mathematical and conceptual errors contained in Mr. Griffith's testimony. Mr. Sekol explained that Mr. Griffith improperly used mixed terminology, which is not totally unexpected since his testimony involved technical actuarial concepts which are often difficult for lay people (such as Mr. Griffith) to grasp. Tr. 378–384. In fact, Mr. Sekol identified one instance where Mr. Griffith had fundamentally erred in calculating a one year change in an unfunded liability level in two Schedule B's by subtracting a beginning of year asset figure from an end of year liability figure, producing a very meaningless number which was clearly a mistake. Mr. Sekol testified that Mr. Griffith's error may have arisen due to the fact that he was inexperienced, not an actuary and had never prepared and certified a Schedule B. Tr. 393. However, coupled with Mr. Griffith's admitted inability to define withdrawal liability, the mathematical error and his lack of experience require that Mr. Griffith's testimony should be given very little weight. More importantly, however, any defendant's evidence which challenges the accuracy of the assessment is irrelevant and will not be considered due to "Transfer's" failure to initiate arbitration.

## B. EACH OF THE FIVE DEFENDANTS ARE MEMBERS OF A CONTROLLED GROUP.

■ The Fund sued "Bus," "Steel," "Terminals" and "Realty" for the withdrawal liability and additional damages incurred by plaintiff on the ground that "Transfer," "Bus," "Steel," "Terminals" and "Realty" were under the common control of Mrs. Sara O. DeBolt within the meaning of 29 U.S.C. Section 1301(b)(1) in 1982 at the time of the withdrawal, and therefore are jointly and severally liable for withdrawal liability. *See Flying Tiger,*

*Inc. v. Teamsters Pension Trust Fund of Philadelphia,* 830 F.2d 1241, 1244 (3d Cir. 1987); *IUE AFL–CIO Pension Trust v. Barker & Williamson,* 788 F.2d 118 (3d Cir.1986). Each of the defendants is a member of a controlled group because they are commonly owned by one individual, Mrs. Sara O. DeBolt. The joint and several liability of all members of a controlled group for another member's withdrawal liability arises under 29 U.S.C. Section 1301(b)(1), which provides:

> "For purposes of this subchapter, under regulations prescribed by the [Pension Benefit Guaranty Corporation], all employees of trades or businesses (whether or not incorporated) which are under common control, shall be treated as employed by a single employer and all such trades and businesses as a single employer."

The requisite level of common ownership required for the imposition of controlled group status is determined under the same test adopted under the Internal Revenue Code for determining whether two or more related companies are within a controlled group. *See IUE AFL–CIO Pension Fund v. Barker–Williamson, Id.* at 126. It is beyond dispute that defendants constitute a brother-sister controlled group within the meaning of 26 U.S.C. Section 1563(a)(2). That section provides that a brother-sister controlled group is established when five or fewer persons own at least 80 percent of the voting stock of each corporation and the same persons own more than 50 percent of the voting stock, taking into account, each person's interest only to the degree of identical stock ownership in each corporation.

The existence of a controlled group is established by virtue of defendants' responses to the Fund's interrogatories, which were accepted into evidence at trial as Ex. 10, 11, 12, 13, and 14. In fact, during the third day of trial, after it was pointed out that "Bus" federal income tax returns contained an affirmation of controlled group status, counsel for "Bus" admitted that "Bus" was a member of a

controlled group with the other defendants. Attorney Carney, counsel for Bus, stated:

> "Mr. Carney: Your Honor, we concede, as we did at the first half hour of the hearing, that the stock ownership facts that were introduced in Exhibits 10–14, or whatever numbers they were, are stock ownership facts which meet the technical definition of a controlled group, both under the Internal Revenue Code and the definitions which ERISA has adopted for these purposes."

In order to determine the ownership of stock for the purpose of determining which corporations are component members of a controlled group, the rules of stock attribution set forth in 26 U.S.C. Section 1563 are applicable. Under the stock attribution rules, a person is treated as owning all stock attributed to him. An individual is considered to own the stock owned by his children 21 years and over if he owns more than 50% of the value or voting power to stock in said corporation. 26 U.S.C. Section 1563(e)(6)(B).

"Transfer" and the other defendants are "trades or business ... under common control" within the meaning of 29 U.S.C. Section 1301(b)(1) by virtue 26 U.S.C. Section 1563(e)(6)(B) and, as such, constitute a "single employer" for purposes of assessing and collecting withdrawal liability under MPPAA. In support of this conclusion, the Fund showed that the defendants filed tax returns which contain representations that they were members of a controlled group.[6]

### 1. *Application of The Controlled Group Test*

Sarah O. DeBolt is the mother of John P.M. DeBolt and George S.D. DeBolt, the only other shareholders of the Defendant corporations. Sarah O. DeBolt, by virtue of the stock attribution rules cited above, owns 100% of the stock of all defendant corporations and is the sole proprietor of the only non-corporate defendant, "Terminals."

The following is a chart setting forth the shareholders and/or owners of the defendant entities and the percentage of stock or ownership held in each of defendant companies.[7]

OWNERSHIP IN PERCENT

| SHAREHOLDERS | "Transfer" A / B | "Steel" | "Terminals" | "Realty" A / B | "Bus" A / B | Identical Stock Ownership A / B |
|---|---|---|---|---|---|---|
| Sarah O. DeBolt | 68/(100) | 100 | Sole Prop. | 96/(100) | 68/(100) | 68/(100) |
| John P.M. DeBolt | 16 | 0 | 0 | 2 | 0 | 0 |
| George S.T. | 16 | 0 | 0 | 2 | 32 | 0 |
| TOTALS | 100/(100) | 100 | 100 | 100 | 100/(100) | 68/(100) |

**6.** An admission of "Bus" membership in a controlled group is contained in the federal tax returns presented at trial and identified during Mr. George S.D. DeBolt's testimony. Tr. 302, Ex. BB (IRS Form 1120S, for 1982, page 2, Line H). Similar responses are contained on the 1982 Form 1120S of Transfer. Ex. K. Since Steel and Realty filed a different form in 1982, i.e. Form 1120 (Ex. I and J), they admit to controlled group status on Schedule J, Line 1. Terminal's tax returns were not provided.

**7.** The shareholders or owner of each defendant is admitted in the responses given by the respective defendants in plaintiffs' first set of interrogatories. Defendants' responses were accepted into evidence at trial. *See* Exhibits Nos. 10, 11, 12, 13 and 14.

Column A: Stock ownership in percent without application of the stock attribution rules of 26 U.S.C. Section 1563(e)(6)(B).

Column B: Stock ownership in percent after application of the stock attribution rules of 26 U.S.C. Section 1563(e)(6)(B).

---

Accordingly, pursuant to the attribution rules (26 U.S.C. Section 1563(a)(2)), Sarah O. DeBolt owns and controls 100% of each of the five defendants. There can be no dispute that the defendants are a controlled group of companies and are thus considered a single employer for purposes of collecting and assessing withdrawal liability under MPPAA.

C. THE CONTROLLED GROUP IS JOINTLY AND SEVERALLY LIABLE FOR WITHDRAWAL LIABILITY OF "TRANSFER".

In order to obtain judgment against "Bus", "Steel", "Terminals" and "Realty" for the withdrawal liability and additional damages incurred by Transfer as the result of its complete withdrawal, the Fund is only required to show that in 1982 all Defendants were members of a controlled group within the meaning of 29 U.S.C. Section 1301(b)(1). Each member of a controlled group is treated as though they are a single employer for purposes of assessing and collecting withdrawal liability triggered by any other member of the controlled group. *See Amalgamated Ins. Fund v. Sheldon Hall Clothing*, 862 F.2d 1020, 1024 (3d Cir.1988); *Flying Tiger Lines v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1244 (3d Cir.1987); *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d 118, 123 (3d Cir.1986); *United Retail & Wholesale Employees v. Yahn & McDonnell*, 787 F.2d 128, 131 n. 2 (3d Cir.1986), *aff'd by an equally divided Court. Pension Benefit Guaranty Corp. v. Yahn & McDonnell*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (per curiam); and, *In Re Mushroom Transportation Co., Inc.*, 90 B.R. 718, 723 (Bankr.E.D. Pa.1988). The significance of the statutory determination that all members of the controlled group are to be treated as though they constitute a single employer is that the Fund is not required to prove that the controlled group members abused their separate entities to evade or avoid withdrawal liability. The Fund is not required to show anything other than mere common ownership.

■ The Fund is justified in assessing and collecting withdrawal liability as if the defendants were one entity. The Fund's right to recover withdrawal liability from all members of the controlled group is not affected by the fact that its assessment was originally addressed solely to "Transfer". This is because notice to one member of a controlled group is notice to all members of the controlled group. In this respect, PBGC stated in the preamble to its regulations on Notice and Collection of Withdrawal Liability, issued pursuant to 29 U.S.C. Section 1399, 49 F.R. 22,642, 22,644 (May 31, 1984) (codified at 29 C.F.R. Paragraph 2644.

"[U]nder ERISA there is a unity of interest in the case of a controlled group of corporations, since the entire controlled group is considered to be a single employer for withdrawal liability and other purposes. Therefore, PBGC believes that a notice of default sent to the contributing entity which is a member of a controlled group of corporations, within the meaning of Section 4001(b)(1) [29 U.S.C. Section 1301(b)(1)], constitutes constructive notice to the other members of the same controlled group."

Many courts have imposed withdrawal liability upon members of a controlled group and in doing so have considered situations presenting notice and Due Process issues which parallel the instant case. The Third Circuit specifically adopted the reasoning of PBGC from the above-cited regulations and has repeatedly held that notice to one member constitutes notice to the entire controlled group. *See Amalgamated Ins. Fund v. Sheldon Hall Clothing*, 862 F.2d at 1024; *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d at

127; and *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d at 132 n. 3.

Separate notice is not required for each controlled group member. In *Western Teamsters Pension Trust Fund v. Allyn Transportation Co.,* 832 F.2d 502, 506 (9th Cir.1987), the Court held that the withdrawn employer and all members of its controlled group were precluded from litigating defenses against the assessment of withdrawal liability because the employer had failed to timely arbitrate its objections. The facts in *Allyn* parallel the instant case because there the pension fund only addressed its notice of withdrawal liability to the controlled group member who had withdrawn from the pension fund. The other members of the controlled group argued that they should not be held responsible in default for one member's liability since they had not received a separate notice. The Ninth Circuit disagreed and held that notice to the withdrawing employer constitutes notice to all members of the controlled group. *Id.* at 506–507. The Court rejected the argument that the pension fund's failure to provide separate notice to all members of the controlled group denied procedural due process to those members of the controlled group who did not receive individual notice. *Id.* at 507.

Other courts have addressed the question of whether the waiver of arbitration by one controlled group member who receives the assessment constitutes a waiver for other members of the controlled group who did not receive the assessment. The courts have uniformly concluded that notice to one *is* notice to all. *See Western Conference of Teamsters Pension Trust Fund v. Lafrenz,* 837 F.2d 892, 895, 1013 (9th Cir. 1988); *Teamsters Pension Trust Fund v. H.F. Johnson, Inc.,* 830 F.2d 1009 (9th Cir. 1987); *Connors v. Petitte Brothers Mining Co.,* C.A. 87–490, D.D.C., March 2, 1988 (Available on Westlaw), 1988 WL 23245; *Teamsters Pension Trust Fund of Philadelphia v. Malone Realty,* 82 B.R. 346, 350 (Bankr.E.D.Pa.1988); *Debrenceni v. J.C. Campbell Paper Co.,* C.A. No. 84–507, D.C.Mass. March 7, 1988, CCH Pension

Plan Guide Paragraph 23, 750S; *Connors v. Brady–Cline Coal Co.,* 668 F.Supp. 5 (D.D.C.1987); *Tri–State Ruber v. Central States Pension Fund,* 677 F.Supp. 516 (E.D.Mich.1987); and *Connors v. Calvert Development,* 622 F.Supp. 877 (D.D.C. 1985).

Defendants contend that the establishment of controlled group liability requires proof of active supervision by the common owner, or at least some showing of economic relationship between members of the controlled group or its owners. These arguments are both legally misplaced and factually inaccurate. Defendants presented testimony at trial to show that "Bus" was separately operated by George S.T. DeBolt and that "Transfer", "Steel", "Terminals", and "Realty" were separately operated by John P.M. DeBolt. John DeBolt testified that he did not consult with his brother, George DeBolt. Tr. 208. George DeBolt testified that his brother, John DeBolt was not actively involved in the management of "Bus". Tr. 276–277. Although Defendants attempted to portray Mrs. Sara DeBolt as an absentee owner exercising no active supervision and deriving no compensation or dividends from the operation of the Defendant businesses, the actual facts appearing on the tax returns show otherwise. These tax returns show that defendants have some inter-company transactions. For instance, "Bus" and "Transfer" own no real estate; the buildings and property are owned by "Realty", which receives rent. *See* Ex. I, K and AA, BB, CC, Tr. 306–307.

In 1982, the year of "Transfer's" complete withdrawal from the Fund, "Transfer's" federal income tax return stated that Mrs. Sara DeBolt and George DeBolt devoted part-time attention to the operation of "Transfer's" business. "Transfer's" Schedule K–1 to Form 1120S (Ex. K) shows that Mrs. Sara DeBolt received payment of $5,209 in compensation, $32,200 in loan repayments and credit for a loss of $70,419, which she could use to offset other income. The same return shows that George DeBolt received compensation from "Transfer" in the amount of $12,200., together with cred-

it for a loss of $15,783. Supporting schedules to "Transfer's" 1982 return also show accounts receivable and accounts payable between affiliates.

For these reasons, it can be seen that defendant's arguments that the five defendant entities are only technically related by virtue of stock ownership, does not accurately describe the situation existing in 1982. In any event, this Court does not have to reach these issues since the existence or non-existence of inter-company transactions is not relevant to the existence of controlled group withdrawal liability.

In light of the separate legal representation of "Bus" on the one hand, and "Transfer", "Steel", "Terminals" and "Realty" on the other hand, the Court will now address the defendant's arguments concerning the purported requirement for actual separate notice to each defendant.

John DeBolt testified that he operated "Transfer", "Steel", "Terminals", and "Realty" and was an officer of each. Tr. 199–200. John DeBolt explained that he received a copy of the Fund's demand for withdrawal liability, which was addressed to "Transfer", but he asserted that "Terminals", "Steel", and "Realty" did not receive the demand letter. Tr. 227. To the extent that "Steel", "Terminals" and "Realty" assert that withdrawal liability cannot be enforced against them as a matter of law because they did not receive separate actual notice. The Third Circuit has addressed and rejected this argument in *Amalgamated Ins. Fund v. Sheldon Hall Clothing*, 862 F.2d 1020, 1024 (3d Cir.1989). The Circuit Court stated that the argument was lacking in merit. There, the Court reaffirmed its rulings in *IUE AFL–CIO Pension Fund v. Barker & Williamson*, 788 F.2d 118, 127, that notice to one member of a commonly controlled group constitutes notice to every member of that group.

In *Amalgamated Ins. Fund v. Sheldton Hall Clothing*, 862 F.2d 1020 (3d Cir.1988), the Court extended this constructive notice rule to individuals operating as sole proprietors. There, the Third Circuit affirmed a lower court judgment against a member of a controlled group operating as a sole proprietor, noting that liability would be found even if there were some technical error of process with regard to the individual proprietor since the withdrawn entity failed to arbitrate its assessment. *Id.* 1024–1025. The Court added that since the individual was president of the corporate employer and had personally received the letter notice of assessment addressed to the corporation, the individual proprietor's argument that he had no notice was disingenuous. *Id.* 1024, n. 4.

Defendants cannot plausibly argue that John DeBolt knew of the assessment for purposes of determing "Transfer's" liability, but did not know of the assessment for purposes of determining the liability of "Steel", "Terminals" or "Realty". John DeBolt cannot properly construct a chinese wall to isolate his knowledge acquired as an officer of "Transfer" from his knowledge as an officer of "Steel", "Terminals" and "Realty". There is absolutely no basis for a finding by this Court that "Steel", "Terminals" and "Realty" are not bound by the knowledge of "Transfer" and liable for the entire withdrawal liability and additional damages.

Notwithstanding the fact that "Bus" concedes that it is a member of the controlled group, "Bus" argues that the mere incidence of common ownership does not justify the imposition of joint and several liability for the withdrawal liability incurred by "Transfer". While "Bus" may argue that it derived no economic benefit from its membership in the controlled group, the uniform authority is that these facts are not relevant to the issue of liability.

"Bus" attempt to isolate its operations from the remaining defendants is futile. George DeBolt testified that "Bus" was economically related to other defendants in the group by admitting that it rented its offices and terminal from "Realty". Tr. 306–307. Furthermore, despite George DeBolt's testimony concerning his lack of involvement with the management of "Transfer" and John DeBolt's lack of involvement with the management of "Bus" (Tr. 276–277), "Transfer's" 1982 federal income tax return (Ex. K) contradicts this testimony.

For example, "Transfer's" 1982 Schedule K–1 for George DeBolt shows he received $12,200, in compensation and describes him as devoting parttime attention to the business of "Transfer". During that year, he owned as many shares in "Transfer" as his brother "John DeBolt". Accordingly, George DeBolt's testimony that he was not involved with "Transfer" is not accurate with respect to the relevant period.

The Fund has proved that the five Defendants have some inter-company dealings, and so the Fund need not prove any specific level of inter-company dealings to support its claim for the imposition of controlled group liability. As the Third Circuit explained in *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 129:

> "The fund can only be expected to provide notice to the corporation that is the ostensible employer of the fund's participants ... Holding the fund responsible for providing notice to all other possible entities that might subsequently be deemed to be in a controlled group with the employer corporation would place the fund in an untenable position."

While it is true that the controlled group members in many of the decisions which are cited have had inter-company dealings and common ownership, under 29 U.S.C. Section 1301(b)(1), common ownership alone is all that is required for joint and several controlled group withdrawal liability. The Ninth Circuit specifically addressed this issue in *Western Conference of Teamsters Pension Trust v. Lafrenz*, 837 F.2d 892, 894–95 (9th Cir.1988), and held that the statute does not condition controlled group liability upon a showing that the members are economically related.

Furthermore, to the extent "Bus" is contending that it had no notice in fact of the Fund's withdrawal liability assessment, this position directly conflicts with the concept of legal notice as explained by the Ninth Circuit in *Teamsters Pension Trust Fund v. H.F. Johnson*, 830 F.2d 1009 (9th Cir.1987). There, the Court concluded that the pension fund's failure to provide separate notice to all members of the controlled group did not violate the Due Process Clause. The Court explained:

> "... the requirement of common control in [29 U.S.C..] Section 1301(b) assures that individuals and entities who may ultimately be held liable for withdrawal liability in fact have notice and an opportunity to contest the existence and extent of that liability."

*Id.* at 1013.

Accordingly, "Bus" cannot successfully argue that it did not "in fact have notice". "In fact notice" exists by virtue of common control.

Accordingly, the clear weight of authority supports the Fund's demand for judgment against "Bus", and the other defendants for the withdrawal liability and additional damages incurred by "Transfer".

## D. COMPUTATION OF DAMAGES

■ The Fund seeks judgment in the amount of "Transfer's" principal withdrawal liability of $355,108, together with interest, liquidated damages and attorney's fees. Since "Transfer", "Bus", "Terminals" and "Realty" are members of a controlled group, this Court finds that each of these defendants is jointly and severally liable for the above elements of damages.

Under 29 U.S.C. Section 1451(b) the Fund's suit to compel payment of withdrawal liability must be treated in the same manner as a suit for the recovery of delinquent contributions within the meaning of 29 U.S.C. Section 1145. As the Third Circuit has explained in *Amalgamated Ins. Fund v. Sheldon Hall Clothing*, 862 F.2d 1020, 1023 (3d Cir.1988) and *Penn Elastic Co. v. United Retail & Wholesale Emp.*, 792 F.2d 45, 47 (3d Cir.1986), judgment for the full principal sum of withdrawal liability, plus additional damages for interest, liquidated damages and attorney's fees is mandated by 29 U.S.C. Sections 1132(g)(2), 1145 and 1451(b).

Although the Fund submitted a detailed written computation of the principal withdrawal liability owed, liquidated damages and interest accrued as of June 30, 1986, (See Exh. 15), the Fund also seeks recovery

of attorney's fees. Accordingly, the Fund is directed to submit updated calculations illustrating the principal withdrawal liability of $355,108, and the other additional damages which have accrued.

### ORDER

AND NOW, this 21st day of May, 1990, it appearing that "Transfer", "Bus", "Steel", "Terminals", and "Realty" are members of a "controlled group" within the meaning of 29 U.S.C. Section 1301(b)(1); that the plaintiff "Fund" is entitled to judgment on the issue of liability against "Transfer", "Steel", "Terminals", "Bus" and "Realty" jointly and severally for the complete withdrawal liability incurred by "Transfer" in the principal amount of $355,108.00, together with interest, liquidated damages and attorney's fees.

NOW THEREFORE, IT IS THE ORDER OF THIS COURT that judgment, jointly and severally, on the issue of liability is entered forthwith against all of five of the named Defendants, "Transfer", "Steel", "Terminals", "Bus" and "Realty".

Judgment is herein jointly and severally entered against all of said named defendants for the complete withdrawal liability incurred by "Transfer" in the principal amount of $355,108.00, together with interest, liquidated damages and attorney's fees.

A hearing shall be scheduled for the purpose of computing the interest, liquidated damages, and attorney's fees now due so as to reduce the same to a dollar amount in addition to and along with the sum of $355,108.00, already adjudged to be due and payable to the Plaintiff Fund.